IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| ALAN BLAKELY and COLELYN BLAKELY, | ) ) ) | Civil No.  2:06-CV-00506 BSJ |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **MEMORANDUM OPINION** **& ORDER** **(Fed. R. Civ. P. 16(c), 56)** |
| USAA CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

```
┌─────────────────────────────────┐
│              FILED              │
│   CLERK, U.S. DISTRICT COURT    │
│    December 6, 2011 (9:45am)    │
│        DISTRICT OF UTAH         │
└─────────────────────────────────┘
```

* * * * * * * * *

On February 16, 2011, this court docketed the mandate of the court of appeals in the above-entitled action.  (*See* Mandate, filed February 16, 2011 (dkt. no. 138).)  The court of appeals had affirmed this court's August 7, 2009 Order granting summary judgment against the plaintiffs Alan and Colelyn Blakely ("the Blakelys") on their claims against USAA Casualty Insurance Company ("USAA") for breach of express contract and intentional infliction of emotional distress, but reversed "the district court's dismissal of their claim for breach of the implied covenant of good faith and fair dealing as frivolous under Rule 16."  *Blakely v. USAA Cas. Ins. Co.*, 633 F.3d 944, 951 (10th Cir. 2011).[1]

---

[1]A remarkable ruling, given the fact that this court's August 7, 2009 Order did *not* dismiss the Blakelys' good faith and fair dealing claim as frivolous, and indeed, did not use the term *frivolous* at all.  (*See* Order of Dismissal, filed August 7, 2009 (dkt. no. 113) ("August 7th Order").)

This court's August 7th Order was actually phrased in the more familiar language of summary judgment, *see, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that summary judgment may be granted if the facts in the record and

(continued...)

Following remand, court and counsel conferred at a March 1, 2011 Status Conference as to what remains to be decided in this case.  The court set a schedule for further motion practice and provisionally calendared a continued Final Pretrial Conference.[2]  (*See* Minute Entry, dated March 1, 2011 (dkt. no. 142).)

On April 15, 2011, USAA filed another motion for summary judgment, this time on the Blakelys' "remaining claim for breach of the implied covenant of good faith and fair dealing,"

---

[1](...continued)
reasonable inferences drawn favorably to the plaintiff "could not lead a rational trier of fact to find for the [plaintiff]"); *Bustos v. A & E Television Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (concluding that a claim was amenable to summary judgment where "no reasonable juror could find" in favor of the plaintiff); *Beardsley v. Farmland Co-Op, Inc.*, 530 F.3d 1309, 1319 (10th Cir. 2008) ("Because no reasonable juror could find that Dick's invitation to Beardsley was binding on Farmland, no triable issue exists"); *Shannon v. Graves*, 257 F.3d 1164, 1167 (10th Cir. 2001) (stating that a ruling granting summary judgment "means that no triable issue exists to be submitted to a jury.").

[2]Prior to the entry of this court's August 7, 2009 Order and the subsequent appeal, this matter had been extensively pretried over the course of no fewer than *six* Final Pretrial Conferences, beginning on March 31, 2008.  (*See* Minute Entry, dated March 31, 2008 (dkt. no. 72).)  Pretrial continued on *June 5th* (*see* Minute Entry, dated June 5, 2008 (dkt. no. 83)), *August 13th* (*see* Minute Entry, dated August 13, 2008 (dkt. no. 87)), *August 28th* (*see* Minute Entry, dated August 28, 2008 (dkt. no. 90)), *September 12th* (*see* Minute Entry, dated September 12, 2008 (dkt. no. 92)), and *December 2d* (*see* Minute Entry, dated December 2, 2008 (dkt. no. 98)).
        Virtually on the eve of the first Final Pretrial Conference, USAA filed a motion for partial summary judgment (dkt. no. 70), which was considered wholly within the context of pretrial.  The Blakelys' claim for "breach of industry standards" under Utah Code Ann. § 31A-26-301 was dismissed at the March 31st Pretrial Conference, and their claim for intentional infliction of emotional distress was dismissed at the June 5th Pretrial Conference.  (*See* Order, filed August 19, 2008 (dkt. no. 86).)  The Blakelys' remaining pleaded claims were dismissed at the conclusion of the sixth Pretrial Conference held on December 2nd.  (*See* Minute Entry, dated December 2, 2008 (dkt. no. 98).)  USAA's counsel submitted proposed forms of order of dismissal—to which the Blakelys' counsel objected—and further conferences with counsel were held on January 30 and June 12, 2009 concerning settlement of the form of the order of dismissal.  (*See* Minute Entry, dated January 30, 2009 (dkt. no. 107); Minute Entry, dated June 12, 2009 (dkt. no. 111).)
        This court drafted its own Order of Dismissal, which was entered on August 7, 2009, as indicated above.

accompanied by a supporting memorandum with exhibits.[3]  Counsel for the Blakelys filed a

memorandum in opposition, also with exhibits,[4] to which counsel for USAA filed a reply.[5]  The

court reviewed the memoranda and exhibits and the motion was calendared for hearing on May 24,

2011.

At the May 24th hearing, L. Rich Humpherys appeared on behalf of the Blakelys; S. Baird

Morgan and Zachary E. Peterson appeared on behalf of USAA.  The court heard and considered

the arguments of counsel, and took the matter under advisement.  (*See* Minute Entry, dated May

24, 2011 (dkt. no. 152).)

Having reviewed and examined the memoranda and exhibits submitted by the parties, as

well as the prior record in this proceeding, and having considered the arguments made by counsel

at the May 24th hearing in light of the pertinent legal authority, this court now concludes that

USAA's motion for summary judgment should be granted to the extent it is based upon USAA's

"fairly debatable" defense under Utah law.

## I.  FACTS BEARING UPON THE BLAKELYS' "BAD FAITH" CLAIM

Once again, the following operative facts are not genuinely at issue:

1.  On August 29, 2002, a fire occurred in the unfinished basement of plaintiffs' home in

Bountiful, Utah.  The Blakelys and USAA agree that this fire was caused by acts or omissions of a

---

[3](*See* USAA's Motion for Summary Judgment, filed April 15, 2011 (dkt. no. 143); USAA'S Memorandum in Support of Motion for Summary Judgment, filed April 15, 2011 (dkt. no. 143) ("USAA Mem.").)

[4](*See* Plaintiffs' Memorandum in Opposition to USAA's Motion for Summary Judgment, filed May 16, 2011 (dkt. no. 147) ("Blakely Mem.").)

[5](*See* Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, filed May 20, 2011 (dkt. no. 148) ("USAA Reply").)

third party, Stone Touch.  Stone Touch worked on refinishing the cement floor of the unfinished

basement of the Blakelys' home.  In the process of this work, fumes from the sealant being used

were ignited by the water heater pilot light and the fire resulted.[6]

2.  At the time of the fire loss, the Blakelys were insured under a homeowner policy issued

by USAA and covering the premises in question.[7]

3.  The Blakelys reported the loss to USAA and within 24 hours a local claim adjuster,

Curtis Camp, arrived at the premises, conducted an initial inspection and assessment and

authorized both the securing of the premises and temporary living accommodations for the

Blakelys.[8]

4.  The Blakelys requested and were paid for two nights' accommodation at the Grand

America Hotel in Salt Lake City.  Thereafter, the Blakelys requested and USAA paid for

temporary living accommodations at a rental home in the Blakelys' neighborhood and did so

through November 30, 2002.  All of these payments were made under the Additional Living

Expense (ALE) provision of the USAA policy.[9]

---

[6](*See* August 7th Order at 2 ¶ 1; USAA Mem. at 3 ¶¶ 1-2; Blakely Mem. at vi ¶¶ 1, 4, xiv ¶ 21; *see also* Defendant's Memorandum in Support of Motion for Partial Summary Judgment, filed March 28, 2008 (dkt. no. 71) ("USAA 3/28/08 Mem."), at vii ¶ 3; Plaintiffs' Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment, filed May 16, 2008 (dkt. no. 75) ("Blakely 5/16/08 Mem."), at ii ¶ 3.)

[7](*See* August 7th Order at 2 ¶ 2; USAA Mem. at 3 ¶ 3; Blakely Mem. at vi ¶ 2; *see also* USAA 3/28/08 Mem. at vii ¶ 2; Blakely 5/16/08 Mem. at ii ¶ 2.)

[8](*See* August 7th Order at 2 ¶ 3; USAA Mem. at 4 ¶ 5; Blakely Mem. at xix ¶ 5; *see also* USAA 3/28/08 Mem. at vii ¶¶ 4-5; Blakely 5/16/08 Mem. at ii ¶¶ 4-5.)

[9](*See* August 7th Order at 2 ¶¶ 4-5; USAA Reply Mem. at 3-4 ¶ 4 ("Plaintiffs were fully paid all requested amounts under their Additional Living Expense Coverage of their policy

(continued...)

5.   During the initial adjustment process, the Blakelys attempted to hire the builder of their

home, Ivory Homes, Inc., to repair the home.  The builder declined because it did not do fire

restoration work.  The Blakelys considered other options, and then agreed to use Phipps

Construction, a contractor pre-approved and urged by USAA, and they signed an agreement with

Phipps Construction for the restoration and repair work.[10]

6.   A principal concern raised by the Blakelys as to Phipps Construction's structural

remodel and restoration plan (under the Dwelling coverage of the USAA policy) concerned the

number of joists in the basement ceiling and main level floor that required replacement or

significant repair work.[11]

7.   Phipps Construction retained an independent structural engineer, Mr. Donald Barfuss,

whose inspection of the Blakelys' homes was conducted on September 9, 2002.  Mr. Barfuss

issued an engineering report[12] identifying which joists needed replacement, which could be

repaired, and which needed cleaning or treatment by the contractor.[13]

---

[9](...continued)
(ALE) which included nights at the most expensive hotel in the state and rent payments at a
comparable home less than a block from their home in Bountiful, Utah (*See* Appraisal award, and
Plntf Exh. 15; appx. 1219-1221)."); Blakely Mem. at xiii ¶¶ 19-20.)

[10](*See* August 7th Order at 2-3 ¶ 6; Affidavit of Alan Blakely, dated May 15, 2008
("Exhibit 9" to Blakely Mem.), at 3 ¶ 7.); Transcript of Hearing, dated September 12, 2008 ("Tr.
9/12/08") at 8:20-9:25 (Mr. Humpherys).)

[11](*See* August 7th Order at 4 ¶ 7; USAA 3/28/08 Mem. at vii ¶¶ 6-7; Blakely 5/16/08
Mem. at ii-iii ¶¶ 6-7; Blakely Mem. at viii-ix ¶ 12(a).)

[12](*See* "Exhibit B" to USAA 3/28/08 Mem.)

[13](*See* August 7th Order at 4 ¶ 7; USAA Mem. at 4 ¶ 7; *cf.* Blakely Mem. at 20 ¶ 7
(stating "it is uncontroverted that Mr. Barfuss's report was limited to structural strength, was 'not

(continued...)

8.  The joist replacement/repair recommendations in the Barfuss report were implemented by Phipps Construction or its subcontractors.[14]

9.  By mid-November, 2002, Phipps Construction completed the work recommended in the Barfuss report and its repair and restoration work in the Blakelys' home.  At that point, still unresolved were some odor and cleaning issues and some personal property claims—claims which USAA submits had ostensibly been resolved and paid by not later than July of 2003, but which the Blakelys insist still remained unresolved.[15]

10.  By July of 2003, USAA had made the following payments to the Blakelys or on the Blakelys' behalf: $47,789.94 for dwelling/structural damage; $37,832.70 for unscheduled personal property; and $7,709.56 for temporary housing, totaling $93,332.20.[16]

---

[13](...continued)
intended to be all inclusive,' that his area of expertise was limited to engineering, that his recommendations would be subject to other factors, such as odor and finishing difficulties, and that he did not intend anyone to rely on the report for anything more than structural resolution."); USAA 3/28/08 Mem. at vii-viii ¶¶ 8-9; Blakely 5/16/08 Mem. at iii ¶¶ 8-9.)

[14](*See* August 7th Order at 4 ¶ 7; USAA Mem. at 4 ¶ 8; USAA Reply at vii ¶ 8 ("It is undisputed that those repairs were performed exactly and completely by Phipps."); *cf.* Blakely Mem. at x ¶ 12(e)(i) (stating that Barfuss had recommended that the joist manufacturer be involved in the inspection, but that Phipps and USAA did not involve the manufacturer's representative in the initial inspection and decision of what joists to replace).)  Mr. Blakely testified that the Barfuss recommendation as to replacement of three to four joists was the position that Phipps took from that point on.  (Deposition of Alan Blakely, dated July 20, 2007, at 95:24-97:24 (*annexed as* "Exhibit 5" [CM/ECF Exh. #6-7] to Blakely 5/16/08 Mem.); *cf.* USAA 3/28/08 Mem. at viii ¶ 10; Blakely 5/16/08 Mem. at iv ¶ 10.)

[15](*See* August 7th Order at 4 ¶ 8; USAA Mem. at 4-5 ¶ 8; *cf.* Blakely Mem. at viii-xi ¶¶ 10-13, xx-xxi ¶ 8; USAA Reply at xii-xiv; USAA 3/28/08 Mem. at viii ¶¶ 11-12; Blakely 5/16/08 Mem. at iv-v ¶¶ 11-12.)

[16](*See* USAA Mem. at 4-5 ¶ 9; Blakely Mem. at xxi ¶ 9; *see also* USAA 3/28/08 Mem. at viii ¶ 13; Blakely 5/16/08 Mem. at v ¶ 13.)

11.  By July of 2003, the Blakelys were still not satisfied with the extent of the floor joist restoration work performed by Phipps Construction pursuant to the Barfuss report, and with the cleaning, repair and restoration of their home and its contents.[17]  But instead of making further demand for payment by USAA of additional amounts within the dwelling, contents and temporary housing coverage under their USAA policy, and instead of invoking the contractual remedies available under the terms of that policy to resolve the issue,[18] the Blakelys changed course.

12.  On July 1, 2003, the Blakelys commenced a civil lawsuit against the basement flooring contractor (Stone Touch) for damages, property and personal injury resulting from the August 29, 2002 fire.  *See Alan Blakely and Colelyn Blakely vs. Desert Rose Roofing, Inc., dba Stone Touch, et al.*, Civil No. 030914762 (3d Dist. Ct., filed July 1, 2003).   Plaintiffs were represented in that action and all related proceedings by attorney Rex Bushman.  A year later, on July 20, 2004,

---

[17](*See* Blakely Mem. at viii-x ¶¶ 10-12(e); USAA Reply Mem. at vii-xiv ¶¶ 10-12 (USAA disputes the record basis for the Blakelys' dissatisfaction with the remediation work as of July 2003, but does not dispute that in July 2003, the Blakelys were in fact dissatisfied).)

[18]The Blakelys' USAA policy contained the following provision regarding when payment would be made:

> **Loss Payment.**  We will adjust all losses with you.  We will pay you unless some other person is named in the policy or is legally entitled to receive payment.  *Loss will be payable 60 days after we receive your proof of loss and*:
> a. *reach an agreement with you*;
> b. there is an entry of a final judgment; or
> c. *there is a filing of an appraisal award with us.*

(USAA Mem. at 3-4 ¶ 4 (quoting *Blakely*, 633 F.3d at 946 (emphasis supplied by the court of appeals).)  The Blakelys argue that this language "does not apply to or supersede USAA's pre-payment duties to investigate, evaluate, and make reasonable offers," and that the Blakelys' "bad  faith theory is that, even if USAA could theoretically forestall payment under the policy until the appraisal award was rendered, it is a breach of those implied duties to unreasonably require an insured to invoke the appraisal process at all."  (Blakely Mem. at xix ¶ 4.)

USAA filed a motion to intervene in that lawsuit, which was granted.[19]

13.   Shortly after USAA intervened in the Stone Touch litigation, the Blakelys notified USAA that they had identified additional losses that they had not previously submitted to USAA. Specifically, the Blakelys' attorney, Rex Bushman, wrote to USAA: "It has become apparent in depositions that plaintiffs have not applied for a significant amount of their losses to their insurer, USAA, because of extreme disappointment with the contractor USAA hired to make remedies for the fire and which while in the process of facilitating remedies offered such a poor performance that further damages were caused my clients."[20]

14.   In conjunction with this letter, the Blakelys attorney also sent USAA a new "inventory of losses" annexed to a letter to Ralph Tate, dated June 30, 2004, as an overall summary of the Blakelys' losses resulting from the fire.[21]  Mr. Bushman wrote that "Plaintiffs['] damages . . . amount to several hundred thousand dollars" and that Stone Touch's insurance may not be sufficient "to fully compensate their loss."  He reiterated that "Plaintiffs were unsatisfied with the total coverage allowed by your client's adjuster," and explained that

> enclosed is documentation *plaintiffs have prepared during the course of this litigation* that will more fully explain their losses.  This itemization should now be reviewed by your client for consideration of further compensation for their extensive losses which to date have not been adequately compensated by their

---

[19](*See* August 7th Order at 4 ¶ 8; USAA Mem. at 5 ¶¶ 11-12; Blakely Mem. at xxi-xxii ¶¶ 11-12; *id.* at 13-14 ¶ 21; USAA Reply at xviii-xix ¶¶ 21-24.)

[20](USAA Mem. at 5-6 ¶ 13 (quoting Letter from Rex Bushman to Ralph Tate, dated July 2, 2004, *annexed as* "Exhibit C" to USAA Mem.); Blakely Mem. at xxii ¶ 13.)

[21](USAA Mem. at 6 ¶ 14; Blakely Mem. at xxii ¶ 14.)

home owner's policy.[22]

The Blakelys' new loss inventory estimated a total repair cost for their dwelling of $303,890.00 and an estimated replacement cost for damaged personal property of $207,133.50.

15.    In response to this renewed claim for additional losses, USAA responded and requested additional information regarding the claims in a letter from Robert Sawyer, a USAA claims adjuster, to Rex Bushman, dated August 27, 2004.[23]  Mr. Sawyer noted that "the information recently supplied to USAA regarding additional claims appears to have some overlap in comparing what USAA has paid for the loss and what is being additionally claimed."

16.   The Blakelys received this letter, and in response, Alan Blakely wrote:

> Given the demands placed upon us at the present time with regard to our ongoing litigation [against Stone Touch], it is *our preference* to delay the matter of additional claims against USAA for the time being.  We therefore request that further examination of this issue *be delayed* pending the resolution of our action against Stone Touch.

(Letter from Alan Blakely to Robert Sawyer, dated September 9, 2004.[24])

17.    On October 13, 2004, the Blakelys' attorney Rex Bushman sent USAA another letter in which he clarified their position: "My clients, Alan and Colelyn Blakely, have for several reasons advised me to inform you that *they will no longer pursue a claim against USAA for their fire loss*. You may, therefore, *close out their request for further reimbursement* for their available coverage on their policy with USAA."  (Letter from Rex Bushman to Ralph Tate, dated October

---

[22]("Exhibit D" to USAA Mem. (emphasis added).  The Blakelys' new loss inventory appeared to have been prepared as answers to interrogatories in the Stone Touch litigation.)

[23](USAA Mem. at 6 ¶ 16 & "Exhibit E"; Blakely Mem. at xxiii ¶ 16.)

[24](August 7th Order at 5 ¶ 12 & Fig. 2; USAA Mem. at 6-7 ¶ 17; Blakely Mem. at xxiii ¶ 17.)

13, 2004 (emphasis added).[25])

18.  Yet as things progressed, the Blakelys realized that despite clear liability, Stone Touch would not pay for all of their damages without a huge, costly fight for which they were then paying attorney's fees by the hour, plus expenses. They had hired a public adjuster, Mr. Nathanael Cook of Adjusters International, to assist them in their damage claims against Stone Touch.  Mr. Cook advised the Blakelys to invoke the "appraisal process," a contractual remedy available under the express terms of their USAA Policy.[26]  Therefore, in January 2005, the Blakelys once again changed course, deciding to pursue their additional claims against USAA under their insurance

---

[25](August 7th Order at 6 & Fig. 3; USAA Mem. at 7 ¶ 18; Blakely Mem. at xxiii ¶ 18.)

[26]As the Utah Supreme Court explains,

> Appraisal, in a general sense, is defined as the "determination of what constitutes a fair price; valuation; estimation of worth." *Black's Law Dictionary* 97 (7th ed. 1999).  An appraisal is an informal, independent investigation conducted by individuals who "base their decisions on their own knowledge." [*Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1062 (5th Cir. 1990).]  An appraisal is conducted "without hearing or judicial inquiry."  6 C.J.S. *Arbitration* § 3 (1975). In addition, unlike arbitration, "appraisal ordinarily settles only a subsidiary or incidental matter rather than the main controversy as does an arbitration award." *Id.*; *see also St. Paul Fire & Marine Ins. Co. v. Wright*, 97 Nev. 308, 629 P.2d 1202, 1203 (1981) ("An appraiser's power generally does not 'encompass the disposition of the entire controversy between the parties . . . [but] extends merely to the resolution of the specific issues of actual cash value and the amount of loss.'" (quoting *In re Delmar Box Co.*, 309 N.Y. 60, 127 N.E.2d 808, 811 (1955))).
> . . . .
> The appraisal determination is either evidence to be considered by the trial court or an award to be enforced, depending upon the contract terms.

*Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶¶ 35-36, 44 P.3d 663, 673.  In this case, the USAA policy provided that a "[l]oss will be payable 60 days after we receive your proof of loss and . . . there is a filing of an appraisal award with us."  *See supra* note 18.

coverage using the appraisal remedy.[27]

19.  Accordingly, Mr. Cook sent USAA a letter dated January 26, 2005, in which he stated

that the Blakelys disagreed with USAA's calculation of their losses.  This notice was the first time

the Blakelys invoked the appraisal remedy under their USAA policy.[28]

20.  Prior to invoking the appraisal remedy in January 2005, the Blakelys had not submitted

a report or opinion from a contractor to USAA that disputed either the September 11, 2002 Barfuss

engineering report or the adequacy of Phipps Construction's structural repairs to the joists that had

been completed in November 2002, based upon Barfuss' report.[29]

21.  The January 26, 2005 Cook letter named the Blakelys' selected appraiser (Joseph

Berger) and requested USAA to do the same within 20 days, as required under the policy.[30]  USAA

promptly responded by letter dated February 8, 2005, notifying the Blakelys that it would use

Kevin Hansen as its representative appraiser.[31]

22.  The Blakelys and USAA proceeded with the appraisal process arising from the

---

[27](*See* USAA Mem. at 7 ¶¶ 19-20; Blakely Mem. at xxiv ¶¶ 19-20, xv ¶ 25; USAA Reply at xix ¶ 25; August 7th Order at 7 ¶ 13 & Fig. 4; *see also* USAA 3/28/08 Mem. at ix-x ¶ 20; Blakely 5/16/08 Mem. at vi-vii ¶ 20.)

[28](*See* August 7th Order at 7 ¶ 13 & Fig. 4; USAA Mem. at 7-8 ¶¶ 20-21; Blakely Mem. at xxiv ¶¶ 20-21.)  Mr. Cook's January 26, 2005 letter referenced an August 29, 2003 date of loss; the Blakely fire occurred on August 29, *2002*.

[29](*See* USAA Mem. at 8 ¶ 22; Blakely Mem. at xxiv ¶ 22.)

[30](*See* USAA Mem. at 8 ¶ 23; Blakely Mem. at xxiv-xxv ¶ 23.)

[31](*See* August 7th Order at 8 ¶ 14 & Fig. 5; USAA Mem. at 8 ¶ 24; Blakely Mem. at xxv ¶ 24.)   In addition, USAA offered to reexamine the Blakelys' claim for additional damages outside the appraisal process in order to expedite a settlement and save all parties the expense of the appraisal—an offer to which the Blakelys did not respond.  (*See* USAA Mem. at 8 ¶¶ 25-26; Blakely Mem. at xxv ¶¶ 25-26.)

Blakelys' $468,575.05 appraisal demand,[32] and on October 18, 2005, the panel issued its final

appraisal award in the amount of $291,356.52.[33]

23.  Based on the appraisal award, USAA timely paid the Blakelys an additional

$197,524.32, representing the difference between the final appraisal award and the $93,332.20

amount that USAA had previously paid to the Blakelys or had disbursed on their behalf.[34]  Upon

receipt of this additional payment, the Blakelys executed a release and subrogation assignment in

favor of USAA on December 5, 2005.[35]

---

[32](*See* August 7th Order at 9 ¶ 15; USAA 3/28/08 Mem. at x ¶ 21 & "Exhibit E"; Blakely 5/16/08 Mem. at vii ¶ 21.)  Besides the claimed $468,575.05 amount, the Blakelys also rely upon figures posited by their own appraiser, Mr. Cook, estimating dwelling repair costs of $150,000 to $175,000, and loss to contents of $220,218.81 (cash value) to $233,702.06 (replacement costs), totaling $370,218.81 to $408,702.06.  (Blakely 5/16/08 Mem. at vii ¶ 21, citing "Exhibit E" to USAA 3/28/08 Mem., *viz.*, Letter from Nathanael Cook to Rex Bushman, dated January 14, 2005).)  But these figures appear to have been "amended by Cook with input from Bradley and Anderson" to arrive at the $468,575.05 figure referenced above—the sum of $286,239.91 (dwelling loss), $162,627.14 (personal property RCV) and $19,709.00 (additional living expense); all of these figures are Cook's estimates.  (*Id.*)

[33](*See* August 7th Order at 9 ¶ 15 & Fig. 6; USAA Mem. at 8 ¶ 27; Blakely Mem. at xxv ¶ 27; *see also* USAA 3/28/08 Mem. at vii ¶ 22; Blakely 5/16/08 Mem. at vii-viii ¶ 22.)  The October 18, 2005 final appraisal award included loss valuations of $210,528.11 (dwelling loss), $64,119.41 (personal property) and $16,709.00 (additional living expense).

[34]The additional payment by USAA based upon the October 2005 award took into account the net loss appraisals of $162,738.17 (dwelling/structural), $26,286.71 ("unscheduled personal property" (personal property or contents)) and $8,999.44 (additional living expense (temporary housing)).  (*See* Blakely 5/16/08 Mem. at vii-viii ¶ 22; *see also* USAA Reply Mem. at iv ¶ 4 ("The only additional living expense allowed by the appraisal panel in this matter was not for the period of the original fire loss but for brief time that would be necessary to relocate if the Blakelys chose to use the appraisal award for replacing floor joists. (See Appraisal Award and acceptance by Blakely Defendant Exh. 65, appx. 1219-21.)")

[35](*See* August 7th Order at 10 ¶ 16 & Fig. 7; USAA Mem. at 8-9 ¶¶ 28-29; Blakely Mem. at xxv-xxvi ¶¶ 28-29; *see also* USAA 3/28/08 Mem. at x ¶ 23; Blakely 5/16/08 Mem. at viii ¶ 23.)  There appears to be a $500 discrepancy between the total amount of the October 2005

(continued...)

-12-

24.  The Blakelys acknowledge that this appraisal award payment by USAA concluded and satisfied all claims under the USAA policy.[36]

25.  Nevertheless, the Blakelys commenced this action against USAA in March of 2006 —three months after USAA's payment of the balance due under the appraisal award, and while their lawsuit against Stone Touch was still pending.[37]

26.  A settlement of all claims of the Blakelys against Stone Touch, the at-fault contractor, was reached in a mediation on or about August 30, 2006.  This settlement included a separate mediated settlement with USAA for its subrogation interest, but embraced the Blakelys' claims for intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, and all other claims that the Blakelys brought or could have brought arising from the fire loss in question. In the mediated Stone Touch settlement, USAA received $205,000 on its subrogation claim of $290,856.52[38] and plaintiffs Colelyn and Alan Blakely received $30,000 on their non-covered

---

[35](...continued)
appraisal award ($291,356.52) and the amount acknowledged as paid in the parties' Subrogation Assignment and Receipt, dated December 5, 2005 ($290,856.52).  (*Compare* August 7th Order, Fig. 6 *with* Fig. 7.)  This difference may reflect the $500 deductible that applies to claims under Section I of the Blakelys' USAA policy.

[36](*See* USAA Mem. at ix ¶ 30; Blakely Mem. at xxvi ¶ 30; *see also* USAA 3/28/08 Mem. at x ¶ 24; Blakely 5/16/08 Mem. at viii ¶ 24. )

[37]*See* Complaint, filed March 29, 2006, in *Alan Blakely and Colelyn Blakely vs. USAA Casualty Insurance Company*, Civil No. 060905176 (3d Dist. Ct., filed March 29, 2006).  After the Blakelys filed their Amended Complaint on June 6, 2006, USAA filed its Notice of Removal on June 23, 2006, invoking the jurisdiction of this court.  (*See* Notice of Removal, filed June 23, 2006 (dkt. no. 1).)

[38](*See* USAA 3/28/08 Mem. at xi ¶ 27; Blakely 5/16/08 Mem. at viii-ix ¶ 27.)

claims, including claims for emotional distress.[39]

27.  Following payment received by USAA on its subrogation claim through settlement, USAA requested documentation from the Blakelys of attorney's fees and costs incurred by them in the Stone Touch litigation.[40]

28.  Upon receipt of the requested documentation, USAA made a payment for attorney's fees and costs to the Blakelys in the amount of $50,000, which was subsequently augmented by an additional payment of $20,695.40 based in part upon additional information gleaned from the November 2007 deposition of Rex Bushman, for a total attorney's fees and costs payment by USAA to the Blakelys of $70,695.40 with respect to the Stone Touch litigation.[41]

## II.  ANALYSIS

### A.  Good Faith and Fair Dealing in the Insurance Context

As a matter of Utah law,

> The implied covenant of good faith and fair dealing . . . inheres in every contract.  *See Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193 . . . . As distinguished from a contract's express terms, the covenant "is based on judicially recognized duties not found within the four corners of the contract." *Christiansen v. Farmers Ins. Exch.*, 2005 UT 21, ¶ 10, 116 P.3d 259 (citing *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985)).  "Under [the covenant], both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Eggett*, 2004 UT 28, ¶ 14, 94 P.3d 193.  Furthermore, the "covenant . . . should prevent either party from impeding the other's performance of his obligations [under the contract]; and . . . one party may not render it difficult or impossible for the other to continue

---

[39](*See* USAA 3/28/08 Mem. at xi ¶ 27 & "Exhibit S"; Blakely 5/16/08 Mem. at vii-ix ¶ 27; August 7th Order at 4-5 ¶ 10.)

[40](*See* USAA 3/28/08 Mem. at ix ¶ 29 & "Exhibits H, H-1, H-2"; Blakely 5/16/08 Mem. at ix ¶ 29.)

[41](*See* USAA 3/28/08 Mem. at ix-x ¶¶ 30-32; Blakely 5/16/08 Mem. at ix-x ¶¶ 30-32.)

> performance and then take advantage of the non-performance he has caused."
> *Zion's Props., Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975) (footnote omitted);
> *see also Advanced Restoration*, 2005 UT App 505, ¶ 34, 126 P.3d 786; *PDQ Lube
> Ctr., Inc. v. Huber*, 949 P.2d 792, 798 (Utah Ct. App. 1997).  Generally, whether a
> party to a contract has acted reasonably "is an objective question to be determined
> without considering the [party's] subjective state of mind."  *Billings v. Union
> Bankers Ins. Co.*, 918 P.2d 461, 465 n. 2 (Utah 1996) (considering whether insurer
> acted in bad faith); *see also Canyon Country Store v. Bracey*, 781 P.2d 414, 421 n.
> 6 (Utah 1989) ("[B]reach of the covenant of good faith and fair dealing is an
> objective question.").

*Markham v. Bradley*, 2007 UT App 379, ¶18, 173 P.3d 865, 871 (McHugh, J.) (some citations

omitted).[42]

The implied covenant of good faith and fair dealing has found specific application in cases

involving insurers and their insureds.  In *Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985),

the Utah Supreme Court announced that in the insurance policy context, the implied covenant of

good faith and fair dealing, which inheres in all contracts, "contemplates, at the very least, that the

insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will

fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the

claim."  *Id.* at 801.[43]  More recent Utah cases echo *Beck*'s articulation of the implied covenant in

the insurance context:

> When an insurer receives an insured's claim for benefits, the insurer must respond
> reasonably and objectively, it "must 'diligently investigate the facts . . ., fairly

---

[42]"[T]he implied covenant of good faith and fair dealing may not be waived by either
party," *Machan v. Unum Life Ins. Co. of Am.*, 2005 UT 37, ¶ 19, 116 P.3d 342, 346 (citing *Beck*,
701 P.2d at 801 n.4), but "parties may, at least to some extent, contractually limit their
expectations under the express terms of the contract by drafting its language accordingly." *Id.*
(footnote omitted).

[43]Likewise, "[i]t seems clear that both parties to an insurance contract should expect that
an insurance company may require a reasonable amount of time to process or investigate a claim
before determining whether to pay or deny it." *Machan*, 2005 UT 37, ¶ 20, 116 P.3d at 347.

evaluate the claim, and . . . act promptly and reasonably in rejecting or settling the claim.'" *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996) (omissions in original) (quoting *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985)).  *The prevailing concern in this context is that the insurer acts reasonably when dealing with its insureds.*

*Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶ 22, 182 P.3d 911, 917 (emphasis added);[44] *see also*

*Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 524, 533; *Gibbs M. Smith, Inc. v.*

*U.S. Fid. & Guar. Co.*, 949 P.2d 337, 344 (Utah 1997).[45]  "In keeping with this

––––––––––––––––––––

[44]In *Beck*, the Utah Supreme Court

joined those jurisdictions that have rejected the traditional view of insurance contracts as commercial contracts for money.  We recognized "the unique nature and purpose of an insurance contract," in that "insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries."  *Beck*, 701 P.2d at 802.  Essentially, what the insured has bargained for in the context of an insurance contract includes both "peace of mind" and the insurance company's payment of whatever sum is owed "within a reasonable period of time." . . .

*Machan v. UNUM Life Ins. Co. of Am.*, 2005 UT 37, ¶ 13, 116 P.3d at 345 (citation omitted).

[45]The court of appeals' opinion in this case reiterated these same principles:

In Utah, a plaintiff may sue on a contract for: (1) breach of the contract's express terms; and/or (2) breach of the covenant of good faith and fair dealing, which is an implied duty that inheres in every contractual relationship.  *See generally Machan v. UNUM Life Ins. Co. of Am.*, 116 P.3d 342 (Utah 2005); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798, 801 (Utah 1985).  While the former claim is confined to the obligations imposed by the contract itself, the latter is not so constrained.  *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 140 (Utah 1992) ("It is true that the insurer's principal duty, under the express terms of the insurance contract, is to pay the liability that the insured incurs, up to a specified dollar limit.  The implied duty of good faith and fair dealing goes beyond the bare contract, however, and gives meaning and substance to the insurer's obligations.").  Instead, "the implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or

(continued...)

-16-

requirement, however,"

> "when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so." [*Billings*, 701 P.2d at 465.]   "[I]f the evidence presented creates a factual issue as to the claim's validity, there exists a debatable reason for denial, . . . eliminating the bad faith claim." *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 34, 56 P.3d 524 (omission in original) (internal quotation marks omitted).

*Id.*  "'When a claim is fairly debatable, the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.'" *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct. App. 1987) (quoting *McLaughlin v. Alabama Farm Bureau Mutual Cas. Ins. Co.*, 437 So.2d 86, 90 (Ala.1983) (citations omitted)); *Larsen v. Allstate Ins. Co.*, 857 P.2d 263, 266 (Utah Ct. App. 1993) (same).  Under Utah law, "[i]f a claim brought by an insured against an insurer is fairly debatable, failure to comply with the insured's demands cannot form the basis of bad faith," *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 24, 133 P.3d 428, 435, *i.e.*, it cannot establish an insurer's breach of the implied covenant of good faith and fair dealing.  Thus,

> "[i]f the evidence presented creates a factual issue as to the claim's validity, there exists a debatable reason for denial, . . . eliminating the bad faith claim." *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct. App. 1987); *see also* 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 204:28 (1999) ("A 'debatable reason,' for purposes of determining whether a first-party insurer may be subjected to bad-faith liability, means an arguable reason, a reason that is open to dispute or question.").

*Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 34, 56 P.3d 524, 535.  "If an insurer acts reasonably in denying a claim, then the insurer did not contravene the covenant." *Id.* at ¶ 28, 56 P.3d at 534 (citing 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 207:53

---

[45](...continued)
settling the claim." *Beck*, 701 P.2d at 801.

*Blakely*, 633 F.3d at 947-48.

(1999)).[46]

"Whether an insured's claim is fairly debatable under a given set of facts is . . . a question of law," *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 464 (Utah 1996),[47] and where an insured's claim was fairly debatable, the insurer's denial did not breach the implied covenant of good faith and fair dealing *as a matter of law*. *Prince*, 2002 UT 68, at ¶ 36, 56 P.3d at 535.[48] Thus, summary judgment is "appropriate on [the insured]'s bad faith claim if [the insurer] established a fairly debatable defense to the claim for coverage under the policy." *Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶ 22, 182 P.3d at 917 (citing *Prince*).

**B. Good Faith and Fair Dealing in the Context of This Case**

**(1) USAA's Legal Theories**

USAA submits that "[b]ecause USAA timely paid the Blakelys all amounts owed under their policy as set forth in the policy, USAA did not, as a matter of law, breach the covenant of good faith and fair dealing," and that this court's grant of summary judgment on the Blakelys'

---

[46]Likewise, if an insurer's "reason for denying benefits under the policy is fairly debatable, then [the insurer's] denial does not rise to the level of outrageous conduct that could give rise to liability for intentional infliction of emotional distress." *Prince*, 2002 UT 68, at ¶ 39, 56 P.3d at 536.

[47]"However, because of the complexity and variety of the facts upon which the fairly debatable determination depends, the legal standard under which this determination is made conveys some discretion to trial judges," *Billings*, 918 P.2d at 464, and "[b]ecause the trial court's determination is steeped heavily in facts," the Utah courts "'grant the trial court's conclusion some deference.'" *Young v. Fire Insurance Exchange*, 2008 UT App 114, ¶ 22, 182 P.3d at 917 (quoting *Prince*, 2002 UT 68, at ¶ 33, 56 P.3d at 535 (quoting *Billings*, 918 P.2d at 464)).

[48]As the *Prince* court concluded, "Because the validity of Prince's PIP benefits claim was fairly debatable, Bear River's denial of benefits did not breach the covenant of good faith and fair dealing as a matter of law. Therefore, the trial court correctly granted Bear River summary judgment on this claim." 2002 UT 68, at ¶ 36, 56 P.3d at 535.

claim for breach of express contract—already affirmed by the court of appeals—serves to

"foreclose plaintiffs' remaining claim in this case."  (USAA Mem. at 2, 3; *see Craner v.*

*Northwestern Mut. Life Ins. Co.*, 12 F. Supp. 2d 1234, 1242 & n.4 (D. Utah 1998) (Greene, J.)

("where there is no breach of an express covenant in a contract, there can be no cause of action for

breach of an implied covenant arising therefrom.").)  Moreover,

> The fairly debatable doctrine allows the USAA to dispute the amount of repairs required under the Blakelys' policy.  Indeed, the insurance policy contemplates that a disagreement could arise and provides for alternative mechanisms in the event the parties are not able to reach an agreement on the amount owed.  An insurer has no duty, express or implied, to abandon its position in favor of the insured where there is a fairly debatable defense in support of a denial of the insured's claim or demand.  *See Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, 54 P.3d 524; *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461 (Utah 1996); *Larsen v. Allstate Ins. Co.*, 857 P.2d 263 (Utah Ct. App. 1993).  Utah Courts recognize, upon the finding of a fairly debatable position on the part of the insurer, that the trial court can and should grant summary judgment dismissing a bad faith claim.  *See Prince v. Bear River Mutual Insurance Company*, 2002 UT 68, ¶ 56, 56 P.3d 524.

(*Id.* at 16.)  USAA argues that "[i]f the Blakelys disagreed with the initial amounts that USAA

paid, the Blakelys could invoke the appraisal process," and that indeed, "USAA was

never presented with any evidence or demand to pay $300,000 until the appraisal process" was

invoked by the Blakelys in January of 2005.  (*Id.*)  "USAA cannot be in bad faith when it was

never presented with a claim for more than what it had paid under the policy" prior to the

Blakelys' January 2005 appraisal demand.  (*Id.* at 17.)[49]

---

[49]The Blakelys' attorney had written to USAA's attorney in June and July 2004 concerning additional claims within USAA's policy coverage, but then wrote in early October 2004 to say that that "they will no longer pursue a claim against USAA for their fire loss," effectively deferring the Blakelys' additional claims until their January 26, 2005 appraisal demand.

**(2) The Blakelys' "but for" Theory**

The Blakelys respond that "but for USAA's breach of its implied duties of reasonable investigation and payment in 2003-2004, the Blakelys would never have been forced into appraisal in 2005." (Blakely Mem. at 1.)  The Blakelys argue that USAA's initial underpayment of their claim "forced the Blakelys to later go through the time and expense of an appraisal process that would have been unnecessary if USAA had met its obligations regarding evaluation and payment of the losses" pursuant to the implied covenant of good faith and fair dealing.  (*Id.* at 6-7 (footnote omitted)).  Shortly after the August 29, 2002 fire, USAA should have undertaken to investigate, evaluate and pay the entire $291,356.52 loss amount that the panel of appraisers ultimately found to be payable under the express terms of USAA's policy, *without the Blakelys ever having to resort to the contractual appraisal remedy*— as they could have in November of 2002, and as they finally did in January of 2005.[50]  Anything less was unreasonable, the Blakelys submit, and amounts to bad faith on the part of USAA—a breach of the implied covenant of good faith and fair dealing.

The Blakelys' dissatisfaction with the extent of the original structural repairs, particularly the limited replacement of charred floor joists pursuant to the Barfuss engineering report and Phipps' handling of cleaning and repair of walls, ceilings, etc., as well as the Blakelys' disagreement with the USAA adjuster's response to their views concerning smoke damage to many items of personal property, (*see* Blakely Mem. at viii-xi ¶¶ 10-13; *id.* at 7), are thus subsumed under USAA's failure to pay nearly $300,000 at the outset of the claims adjustment

---

[50]As summarized by the court of appeals, "The Blakelys argue that they would not have had to invoke the appraisal demand clause had USAA acted reasonably in assessing and paying their claim."  *Blakely*, 633 F.3d at 948 n.1.

process following the August 29, 2002 fire, without waiting for the Blakelys to resort to the

appraisal remedy.[51]  Thus, according to the Blakelys, USAA relies upon the express payment and

appraisal provisions of its policy at its own peril: "even if USAA could theoretically forestall

payment under the policy until the appraisal award was rendered, it is a breach of those implied

duties to unreasonably require an insured to invoke the appraisal process at all."  (Blakely Mem. at

xix ¶ 4.)[52]

### (3) Dismissal of the Blakelys' Breach of Contract Claim Does Not Preclude Their Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

It seems apparent from the court of appeals' opinion that the conclusion that USAA did not

breach the express terms of its contract does *not* foreclose the Blakelys' claim for breach of the

implied covenant of good faith and fair dealing:

---

[51](*See* Transcript of Hearing, dated December 2, 2008 ("Tr. 12/2/08"), at 49:17-21 ("THE COURT: What should they have done? Should they have paid you roughly $300,000 that you got later? MR. HUMPHERYS: Absolutely they should have. They should have done that from the outset.")

[52]The court of appeals has already reached the opposite conclusion under the express terms of the USAA policy:

> Although the Blakelys point to USAA's refusal to pay the amount of loss they claimed prior to their invocation of the appraisal demand clause, nothing in the policy required USAA to do so.  Instead the policy provided for a mechanism— the appraisal process—to determine the amount of loss when USAA and the insured could not reach an agreement.  USAA complied with that provision and timely paid the Blakelys in accordance with the clause. Indeed, the Blakelys admit that with the payment of the appraisal award, no further amounts are either claimed or owing under the terms of the policy, and the Blakelys do not identify any provision in the insurance policy they contend USAA violated.  Because USAA complied with all of the express terms of the policy held by the Blakelys, including the appraisal demand clause, USAA is entitled to summary judgment on the Blakelys' claim for breach of express contract.

*Blakely*, 633 F.3d at 948.

Certainly, USAA's compliance with the appraisal demand clause and the other express provisions of the policy does not, as a matter of law, preclude a cause of action for breach of the implied covenant of good faith and fair dealing and for consequential damages resulting from any such breach. *See Miller v. USAA Cas. Ins. Co.*, 44 P.3d 663, 668, 677 (Utah 2002) (holding that claims other than for breach of the express terms of the insurance policy, i.e., for bad faith and consequential damages, cannot be resolved under an appraisal clause similar to the one at issue in this case). But compliance with the appraisal demand clause and the other express provisions of the policy *does* preclude a cause of action for breach of express contract. . . . Accordingly, the district court properly granted summary judgment to USAA on the Blakelys' claim for breach of express contract and any request for damages they sought under that claim based on its correct conclusion that USAA had complied fully with the express terms of the policy.

*Blakely*, 633 F.3d at 949 n.2 (emphasis in original). The Blakelys' good faith and fair dealing claim is not precluded by "law of the case" or related principles as a result of the denial of their breach of contract claim.[53]

**(4) The Blakelys' "but for" Theory and USAA's "Fairly Debatable" Defense**

At the same time, the Blakelys' "but for" theory—equating the Blakelys' resort to the contractual appraisal remedy with a breach by USAA of the implied covenant of good faith and

---

[53]USAA's assertions that an implied term cannot contradict an express contract term and that the implied covenant of good faith and fair dealing may not be construed to imply "new, independent rights or duties not agreed upon by the parties," *Brehany v. Nordstrom*, 812 P.2d 49, 55 (Utah 1991), are largely correct. *See generally Restatement (Second) of Contracts* § 205 (1981). But in the first-party insurance context under Utah law, the implied covenant appears to be something of a hybrid. As *Beck* explains, "because the considerations are similar, we freely look to the tort cases that have described the incidents of the duty of good faith in the context of first-party insurance contracts." *Beck*, 701 P.2d at 801; *see also* Note, *Breach of an Insurer's Good Faith Duty to its Insured: Tort or Contract?*, 1988 Utah L. Rev. 135, 147 (1988) (observing that "[t]he practical effect of the *Beck* decision is to allow recovery of tort damages by an insured bringing a cause of action in contract without allowing punitive damages against the insurance company. . . . Because 'classical contract law neither deters wrongdoing nor fully compensates the insured for covered, first-party losses,' the *Beck* court reached an equitable compromise by awarding foreseeable extra-contractual damages where an insurance company breaches its duty to deal in good faith with its insured." (footnote omitted)); *Billings*, 918 P.2d at 466.

fair dealing—ratchets USAA's duty under the implied covenant too far beyond the Utah law standard, leaving little or no room for Utah's clearly established "fairly debatable" defense.

Under Utah law, a reasonable insurer *may decline payment of a fairly debatable claim* until the dispute is formally resolved, *e.g.*, through civil litigation or the appraisal process. As the Utah Supreme Court has explained,

> the implied covenant imposes a duty on first-party insurers to act in an objectively reasonable manner in handling an insured's claim. It would not further *Beck*'s purpose of encouraging insurers to act reasonably if we were to impose the broad consequential damages allowed in *Beck* on every insurer who is ultimately determined by a court to have incorrectly denied coverage, regardless of how reasonable the denial. Such an insurer ought to incur no greater damage exposure than any other person breaching the express terms of a contract. Indeed, *it would be unfair not to permit an insurer who has a legitimate dispute with an insured over a claim to have the dispute resolved before having to pay the claim*. Exposure to the sweeping measure of damages available for breach of the implied covenant would effectively *deny any careful insurer the option of declining to pay a contested claim and awaiting the outcome of the dispute*.

*Billings*, 918 P.2d at 466-67 (emphasis added); *see Machan v. UNUM Life Ins. Co. of America*, 2005 UT 37, ¶¶ 18, 20, 116 P.3d at 346, 347. In *Billings*, the Utah Supreme Court explicitly rejected a reading of *Beck* "suggesting that the covenant of good faith and fair dealing imposes something akin to strict liability, i.e., if a claim is denied and a court later determines it should have been granted, the insurer is liable for breaching the implied covenant, regardless of how reasonable it was to deny coverage." *Id.* at 465 n.2.

The question here thus becomes whether USAA breached its duty under *Beck* to "'diligently investigate the facts to enable it to determine whether a claim is valid, [to] fairly evaluate the claim, and [to] thereafter act promptly and reasonably in rejecting or settling the claim.'" *Blakely*, 633 F.3d at 948 (quoting *Beck*, 701 P.2d at 801), or whether USAA's payment

for fire losses at the time of the initial investigation in 2002 was a reasonable response, or at least a response to a "fairly debatable" claim by its insureds.

At the December 2, 2008 pretrial conference, counsel for the Blakelys outlined what they contend would have been the reasonable response in this case:

> If USAA had performed its duties under the contract and under its implied duties of good faith and fair dealing, what would the picture be? The picture would be . . . that within six to eight months the home would have been fully repaired and paid for.  All of the items would have been replaced and cleaned.  And there would have been no need to sue Stone Touch, the third-party contractor. There would have been no need for an appraiser. There would have been no need for this case or anything else.  So that's what should have happened had USAA performed its duties as it was required to.

(Tr. 12/2/08, at 48:24-49:12 (Mr. Humpherys).)  Thus, according to plaintiffs' counsel, a "reasonable" response required that USAA promptly accede to all of the Blakelys' demands, requests and preferences concerning the restoration of their home and the repair or replacement of much of its contents, without hesitation or any dispute that would require the Blakelys to pursue the contractual appraisal remedy, or even litigation.

From an insured's perspective in dealing with an insurer, such would be an *ideal* response to this kind of loss—and one that in this instance enjoys the full benefit of hindsight.  But under Utah law, the implied covenant of good faith and fair dealing does not demand an ideal response from an insurer; it requires a *reasonable* response, leaving room for disagreement between the insured and the insurer about "fairly debatable" matters, based upon information available at or shortly after the time of the loss.

Following the August 29, 2002 fire, USAA's adjuster Curtis Camp promptly investigated the Blakely's loss, and USAA covered the Blakelys' temporary housing expenses through

-24-

November 30, 2002.  In September 2002, Phipps Construction, a contractor preferred by USAA and *chosen* by the Blakelys, undertook to do repair and restoration work to the dwelling, consulting with Donald Barfuss, an independent structural engineer, concerning the replacement and repair of charred floor joists.  In November 2002, Phipps completed its structural repairs, and thereafter the Blakelys continued to address smoke damage, cleaning and odor issues involving the house and its contents with Phipps and another USAA adjuster, Linda Mabry.[54]

By July of 2003, USAA had made the following payments to the Blakelys or on the Blakelys' behalf: $47,789.94 for dwelling/structural damage; $37,832.70 for unscheduled personal property; and $7,709.56 for temporary housing, totaling $93,332.20. At this point, it appears uncontroverted that the Blakelys believed that the amount paid by USAA in 2003 understated the value of their loss resulting from the fire, particularly as to the charring of floor joists and the repair or replacement of damaged personal property.

Under their USAA policy, if the Blakelys disagreed with the adjusters' loss evaluation in November 2002 or July 2003, they could invoke the contractual appraisal process—and could do so any time there was a dispute as to valuation of their loss.[55]

---

[54](*See, e.g.*, Deposition of Linda Mabry (excerpts), dated June 13,2007, appended as "Exhibit 7" to Blakely Mem.)

[55]The Blakelys' USAA policy provides:

> **Appraisal.**  If you and we do not agree on the amount of loss, either party can demand that the amount of the loss be determined by appraisal.  If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand.  The two appraisers will then select a competent, impartial umpire. If the two appraisers are not able to agree upon the umpire within 15 days, you and we can ask a judge of a court of record in the state where the residence

(continued...)

The Blakelys did not invoke the appraisal process in November of 2002, or in July of 2003. Nor did they submit any additional claims or proof of loss to USAA until the end of June 2004—when they asserted a loss under their dwelling coverage of $303,890.00 and an estimated replacement cost for damaged personal property of $207,133.50—claims which they subsequently appeared to abandon when their attorney informed USAA in October 2004 that "they will no longer pursue a claim against USAA for their fire loss."  Instead, they had filed suit against Stone Touch in July of 2003 to recover their damages resulting from the fire caused by its employee, and they proceeded with the litigation of that action until it was ultimately settled in August of 2006. The passage of time from July 2003 until commencement of the appraisal process in January 2005 thus cannot fairly be characterized as delay attributable to USAA.[56]

Finally, in January of 2005, the Blakelys invoked the appraisal remedy for the first time, and the matter proceeded to a final appraisal award in October 2005 of $291,356.52, representing the valuation of the Blakelys' total fire loss in 2002, including the $93,332.20 already paid by USAA.

---

[55](...continued)
premises is located to select an umpire.  The appraisers will then set the amount of loss. If they submit a written report of any agreement to us, the amount agreed upon will be the amount of loss.  If they fail to agree within a reasonable time, they will submit their differences to the umpire.  Written agreement signed by any two of these three will set the amount of the loss.  Each appraiser will be paid by the party selecting that appraiser.  Other expenses of the appraisal and the compensation of the umpire will be equally paid by you and us.

[56]A similar circumstance arose in *Beck*: "From January until late June, Beck was apparently negotiating with the car owner's carrier and not with Farmers, for no claim was filed with Farmers until June 23rd.  Therefore, none of the delay between January and June 23rd can be attributed to Farmers."  *Beck*, 701 P.2d at 802.

The Blakelys' point to the $198,024.32 disparity between the $93,332.20 initially paid by USAA and the $291,356.52 final appraisal award in 2005, arguing that "[w]hile the gross disparity between the Blakelys' actual loss and the amount USAA had been willing to pay does not mandate a finding of bad faith, it is evidence that the insurer's position was unreasonable."  (Blakely Mem. at 3.)

Of course, this court cannot overlook the similar $177,218.53 disparity between the final appraisal award and the Blakelys' $468,575.05 appraisal demand (or the $219,666.98 difference between the final appraisal award and the $511,023.50 in covered losses asserted by the Blakelys' counsel in June 2004 and then seemingly abandoned in October 2004).

Comparing the differences among the loss amounts paid, claimed, and appraised proves to be instructive:

| USAA coverage | USAA payments '03 | Blakely demand | Appraisal award |
|---|---|---|---|
| Dwelling loss | $47,789.94 | $286,239.91 | 210,528.11 |
| Personal property | $37,832.70 | 162,627.14 | 64,119.41 |
| Add'l Living Exp. | $7,709.56 | $19,709.00 | 16,709.00 |
| **TOTAL** | $93,332.20 | $468,575.05 | $291,356.52 |

The greatest difference between what USAA initially paid in 2003 and the final appraisal amount in 2005 had to do with dwelling loss coverage: the appraisal awarded $162,738.17 *more* than the $47,789.94 paid by USAA for the Phipps repairs, a difference largely related to the replacement cost of charred floor joists.  At the same time, the final appraisal amount was $75,711.80 *less* than the Blakelys' appraisal demand for dwelling loss.

The Phipps' replacement or refurbishment of the floor joists largely followed the

-27-

recommendations of the September 11, 2002 Barfuss engineering report.  Prior to invoking the appraisal remedy in January 2005, the Blakelys did not submit a report or opinion from a contractor, engineer or appraiser to USAA that disputed the Barfuss engineering report, or the adequacy of Phipps Construction's structural repairs to the joists that had been completed in November 2002 based upon Barfuss' report.  A post-appraisal evaluation of the joist repairs by Mark Ingersoll—cited by the Blakelys—found some shortcomings in the Phipps restoration work, but noted that the joist manufacturer apparently "was in agreement with Mr. Barfuss that many of the floor joists involved in this fire did not require replacement.  Based upon our experience and examination of the photographs, we support that position."[57]

Conversely, the greatest difference between the Blakelys' claimed loss and the final appraisal award concerned personal property: the appraisal awarded $98,507.83 *less* than the $162,627.14 claimed by the Blakelys, and only $26,287.01 more than the $37,832.70 paid by USAA by July 2003.

These differences lend some support to the Blakelys' contention that USAA significantly undervalued the extent of the fire loss to their home and its contents in its initial claim adjustment.  Yet these differences also suggest that the Blakelys' claims significantly overstated the extent of their fire loss, particularly as to personal property that they have insisted should be replaced.

Moreover, these differences in evaluation of the Blakelys' fire loss in 2002 indicate that

---

[57]("Exhibit 5" to the Blakely Mem. at 6.)  It also appeared to Ingersoll that "while there is some question as to whether Phipps Construction completely removed smoke and char residue prior to applying the Kilz sealer, there is no indication in the file that Bryan Phipps ever went back to USAA and asked for authorization to complete additional remedial work."  (*Id.* at 7.)  It proves difficult to characterize USAA as denying the Blakelys' claims for additional structural repairs if their contractor never asked USAA to pay for it.

had USAA paid $297,000 by July 2003, the Blakelys likely would have still been dissatisfied because that amount was still nearly $200,000 less than what they claimed it should be in their June 2004 correspondence and their January 2005 appraisal demand.[58]  Nothing in the record suggests that the Blakelys would have thought in 2003 that USAA's payment of an additional $27,000 would have resolved all of their personal property loss concerns.  The 2005 final appraisal award was $197,000 more than what USAA initially paid, but it was also $177,000 less than what the Blakelys claimed as their loss.

The uncontroverted facts in the record indicate that USAA did not correctly evaluate the full extent of the Blakelys' fire loss within the coverage under their USAA policy in its initial investigation in 2002-2003.  Those facts also lead to the conclusion that the Blakelys' claims under their dwelling, personal property and additional living expense coverage in 2003 were *fairly debatable*, as was USAA's initial response to those claims.  Because the Blakelys' claim for a covered fire loss of over $468,000 was fairly debatable, USAA's failure to pay more than it already had on that claim until the conclusion of the appraisal process invoked by the Blakelys does not breach the implied covenant of good faith and fair dealing as a matter of law.  *See Prince*, 2002 UT 68, at ¶ 36, 56 P.3d at 535.  The fact that there was a subsequent appraisal award significantly in excess of the original amount paid by USAA does not, as a matter of law, indicate that USAA's original position was not fairly debatable, or that it was asserted in bad faith.  Therefore, USAA's motion for summary judgment should be granted to the extent it is based upon USAA's "fairly debatable" defense.  To the extent it is based upon a theory of preclusion based

---

[58]The Blakelys' counsel acknowledged that the extent of the Blakelys' fire loss did not increase in the months that followed the August 29, 2002 fire.  (Transcript of Hearing, dated May 24, 2011, at 46:18-47:6 (Mr. Humpherys).)

upon the prior dismissal of the Blakely's claims for breach of express contract, USAA's motion

for summary judgment should be deemed to be denied.

### C.  A Note on Fed. R. Civ. P. 16(c), 56 and DUCivR 56-1

Rule 56(c) of the Federal Rules of Civil Procedure reads in part:

**(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

This court's Local Rule, DUCivR 56-1(b), similarly requires that

[t]he memorandum in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which movant contends no genuine issue exists. The facts must be numbered and *refer with particularity to those portions of the record on which movant relies*."  (Emphasis added).

DUCivR 56-1(c) likewise requires that

[a] memorandum in opposition to a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists.   Each fact in dispute must be numbered, *must refer with particularity to those portions of the record on which the opposing party relies* and, if applicable, must state the number of the movant's fact that is disputed. (Emphasis added.)[59]

---

[59]DUCivR 56-1(c) also spells out the consequence of failing to respond as the Rule requires:

All material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the statement of the movant will be deemed admitted

(continued...)

-30-

In briefing its pending motion for summary judgment, USAA often cites to the uncontroverted facts enumerated in this court's August 7th Order.[60]  USAA also cites to the court of appeals' summary of the factual background as set forth in 633 F.3d at 946-47.  In some instances, USAA cites to exhibits annexed to its own memorandum in support; in other instances,

_____

[59](...continued)
for the purpose of summary judgment, unless specifically controverted by the statement of the opposing party identifying material facts of record meeting the requirements of Fed. R. Civ. P. 56.

Fed. R. Civ. P. 56(e) also addresses the consequences of such a failure:

**(e) Failing to Properly Support or Address a Fact.**  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

(4) issue any other appropriate order.

[60]Where USAA cited to this court's August 7th Order in its Statement of Facts, the Blakelys consistently responded that "the cited Order of Dismissal has been reversed by the Tenth Circuit with respect to this claim, having concluded that the order failed to identify evidence supportive of the Blakelys' claims." (Blakely Mem. at 20 ¶ 7.)  The court of appeals reversed the August 7th Order's dismissal of the Blakelys' implied covenant claim on the sole ground that their claim was not "frivolous" within the meaning of Fed. R. Civ. P. 16(c)(2)(A), pointing to evidence the Blakelys had "put forth . . . suggesting that USAA acted unreasonably in taking its initial position regarding the loss amount."  *Blakely*, 633 F.3d at 949, 950.  The *Blakely* panel observed that "[a]lthough we express no opinion on the ultimate merits of the Blakelys' claim for breach of the implied covenant of good faith and fair dealing, or whether the evidence is sufficient to withstand any other type of dispositive motion, it is abundantly clear that this claim is not wholly incredible."  *Id.* at 950.
    Of course, this court had never said the Blakelys' claim was "wholly incredible," or frivolous under Fed. R. Civ. P. 16(c)(2)(A).  (*See* August 7th Order, *passim*.)

-31-

USAA cites to record materials by reference to page numbers in the Appendix on appeal.

In the memorandum opposing summary judgment, counsel for the Blakelys primarily cites to ten exhibits annexed to their memorandum, including letters, deposition excerpts and the Blakelys' 2008 affidavits, and frequently cites to "Exhibit 1."  The Blakelys' "Exhibit 1" is a grab-bag of scattered fragments of the Appendix on appeal—referenced only by Appendix page numbers—including letters, an expert report, snippets of various hearing and deposition transcripts, portions of the Blakelys' affidavits, and other documents, including what appears to be part of an affidavit by Rex Bushman.  The 122 pages or so of "Exhibit 1" materials are not specifically identified or indexed, and are certainly not authenticated.[61]

Lest there be any doubt or confusion on anyone's part, "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and  "refer[ring] with particularity to those portions of the record on which movant relies," DUCivR 56-1(b), or "refer[ring] with particularity to those portions of the record on which the opposing party relies," DUCivR 56-1(c), means to refer to the record materials in *particular*, which the online *Oxford English Dictionary* defines as "a unit or one among a number; taken or considered as an individual, apart from the rest; single; distinct, individual, specific,"[62] and which *Merriam-Webster* defines as "of, relating to, or being a

_____

[61]The court of appeals' docket reflects that on March 25, 2010, the Blakelys filed an original and one copy of their Appendix on appeal, consisting of 2,534 pages in seven volumes, "Hardcopy only."  The Blakelys' "Exhibit 1," annexed to their opposition memorandum, thus represents a little less than five percent of the record materials presented to the court of appeals.

[62]*The Oxford English Dictionary, at* http://www.oed.com/view/Entry/138260?rskey=VU7v6R&result=1&isAdvanced=false#eid (December 5, 2011); *see also* 11 *The Oxford English Dictionary* 270 (2d ed. 1989, 1998) (defined as "[p]ertaining or relating to a single definite thing or person, or set of things or persons, as distinguished from others; of or belonging to some one thing (etc.) and not to any

(continued...)

single person or thing. "[63]   The "portions of the record" to which DUCivR 56-1 refers are those

*particular*—specific, individually identified—materials in the record upon which the party relies,

"including depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . .,  admissions, interrogatory answers, or other materials" contemplated by Fed. R.

Civ. P. 56(c) as being an appropriate footing for deciding a motion for summary judgment.  *See*

10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* §§

2722-2724 (3d ed. 1998).

     And both Fed. R. Civ. P. 56(c) and DUCivR 56-1 refer to the record before *this court*.

     This is not the court of appeals.  The Appendix on appeal was *not* filed with this court and

is not available to this court through the much-heralded CM/ECF electronic docketing system.

Citation by page number to the 122-page aggregation of scattered fragments of that Appendix that

comprises the Blakelys' "Exhibit 1"  cannot substitute for the item-specific reference "with

particularity to those portions of the record on which the opposing party relies" contemplated by

DUCivR 56-1(c) and Fed. R. Civ. P. 56(c)(1)(A).  Similarly, citation to record materials solely by

their Appendix pagination does not meaningfully identify specific, individual items in the record

to which USAA's counsel would have this court refer.

     In deciding USAA's current motion for summary judgment, this court has exercised its

discretion under Fed. R. Civ. P. 56(c)(3) to consider materials in the record not directly cited by

---

[62](...continued)
other, or to some and not all . . . .").

    [63] *Merriam-Webster's Collegiate Dictionary* 903 (11th ed. 2003).

the parties' memoranda,[64] including the parties' prior memoranda supporting and opposing summary judgment filed in 2008, exhibits appended to and record materials cited by those memoranda, and the parties' stipulated list of exhibits as submitted by counsel at the Final Pretrial Conference.  The court has examined the parties' respective Statements of Facts in some detail and has attempted to correlate those fact statements with each other, and with the materials in the record as contemplated by Fed. R. Civ. P. 56(c)(1)(A).  Many of those fact statements were admitted, or at least not substantially controverted, in 2008, and many were admitted or not substantially disputed in the parties' current summary judgment memoranda.[65]

The absence of a genuine issue of material fact as to the Blakelys' claim also became apparent from the record of this court's extended colloquy with counsel during the continuing Final Pretrial Conference.[66]  Indeed, USAA's prior summary judgment motion was heard and considered—and granted—entirely within the context of the continuing Final Pretrial Conference.  That pretrial record informs this court's consideration of USAA's current motion.

"Rule 16(c) now lists 16 subjects that may be considered, and concerning which the court may take appropriate action, at a pretrial conference."  Charles A. Wright & Mary K. Kane, *Law of Federal Courts* § 91, at 650 (6th ed. 2002) (footnote omitted).  Among those subjects we find the following:

---

[64]Fed. R. Civ. P. 56(c)(3) reads: "The court need consider only the cited materials, but it may consider other materials in the record."

[65]Even fact statements flagged as "disputed" in the memoranda proved to be substantially uncontroverted as to the *facts* themselves.  Often what was actually disputed was the meaning or significance of a specific fact statement with respect to the parties' competing legal arguments.

[66]*See supra* note 2.

**(2)** *Matters for Consideration*. At any pretrial conference, the court may consider and take appropriate action on the following matters:

(A) *formulating and simplifying the issues*, and eliminating frivolous claims or defenses;

(B) amending the pleadings if necessary or desirable;

(C) *obtaining admissions and stipulations about facts and documents* to avoid unnecessary proof, and ruling in advance on the admissibility of evidence;

(D) avoiding unnecessary proof and cumulative evidence, and limiting the use of testimony under Federal Rule of Evidence 702;

(E) *determining the appropriateness and timing of summary adjudication under Rule 56*;
. . . .
(G) *identifying witnesses and documents*, scheduling the filing and exchange of any pretrial briefs, and setting dates for further conferences and for trial;
. . . .
(J) *determining the form and content of the pretrial order*;

(K) *disposing of pending motions*;
. . . .
(P) facilitating in other ways the just, speedy, and inexpensive disposition of the action.

Fed. R. Civ. P. 16(c)(2) (emphasis added).  First and foremost among these subjects is

"formulating and simplifying the issues" for trial:

> The reference in Rule 16(c)(1) to "formulation" is intended to clarify and confirm the court's power to identify the litigable issues.  It has been added in the hope of promoting efficiency and conserving judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone.  See generally *Meadow Gold Prods. Co. v. Wright*, 278 F.2d 867 (D.C. Cir. 1960).

Fed. R. Civ. P. 16 advisory committee note to 1983 amendment.[67]  "The court thus is directed to

---

[67]In *Meadow Gold*, the court observed that "the pretrial procedure, when utilized, becomes the principal means of defining the issues in a case and the legal theories upon which they are to be tried."  278 F.2d at 869.

define the issues, facts, and theories actually in contention, which means that extraneous issues should be weeded out . . . ."  6A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1525, at 351-52 (3d ed. 2010) (footnotes omitted).  As the court of appeals explained some years ago: "The salutary, indeed the desirable and efficacious, purpose of a pretrial conference is to sift the discovered and discoverable facts to determine the triable issues, both factual and legal, and to chart the course of the lawsuit accordingly."  *Lynch v. Call*, 261 F.2d 130, 132 (10th Cir. 1958).

At a Rule 16(c) pretrial conference, "Counsel must make full and fair disclosure of their views about what the real issues of the trial will be."  Charles A. Wright & Mary K. Kane, *Law of Federal Courts* § 91, at 650-51.  Such full and fair disclosure lends itself to determining the "content of the final pretrial order"—where genuine triable issues of fact do exist[68]—and to "determining the appropriateness and timing of summary adjudication under Rule 56," where they do not.[69]

---

[68]As the result of the winnowing process during the extended Final Pretrial Conference, this court "conclude[d] that there exist no triable issues of material fact," (August 7th Order at 1), *i.e.*, that there was nothing left to try, and thus no Pretrial Order was entered in this case.

[69]Thus, the single reference to Fed. R. Civ. P. 16(c) in the caption of this court's August 7th Order—and in the caption of *this* Memorandum Opinion & Order—has everything to do with the identification, narrowing and simplification of issues for trial or for Rule 56 adjudication, as well as the context in which legal rulings were made in this case.  In this instance, it had nothing to do with "eliminating frivolous claims or defenses."  As noted above, this court has never used the term "frivolous" with reference to the Blakelys' claims.

Rule 16(c)(2)(E) "recognizes that the use of Rule 56 to avoid or limit the scope of trial is an appropriate topic that may be discussed during the conference."  6A *Federal Practice and Procedure* § 1525, at 358.  Where a party fails to demonstrate at pretrial that a triable issue of fact exists, summary judgment may even be granted *sua sponte*.  *See, e.g.*, *Sommer v. Davis*, 317 F.3d 686, 695-96 (6th Cir.), *cert. denied,* 540 U.S. 824 (2003); *and generally* 10A *Federal Practice and Procedure* § 2720, at 339-45.  In this case, the court of appeals noted that

(continued...)

On the record now before this court, the undisputed material facts enumerated in this court's August 7th Order remain essentially uncontroverted today, though the narrative sequence of events now benefits from further elaboration, largely tracking the parties' own DUCivR 56-1(b)-(c) statements of fact having such support as may be gleaned from the record as it exists.

**CONCLUSION**

USAA's current Rule 56 motion turns on a question of law, namely whether the Blakelys' claim for fire loss and USAA's response in 2003 were "fairly debatable" under the circumstances existing at that time.  This court concludes once again that they were.

As explained above, where an insured's claim was fairly debatable at the time it arose, Utah law affords the insurer the option of declining to pay a contested claim and awaiting the outcome of the dispute; and the insurer's "failure to comply with the insured's demands cannot

---

[69](...continued)
although a district court may grant summary judgment sua sponte, it must give the losing party an adequate opportunity to oppose summary judgment.  *N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800, 816 (10th Cir. 2000) (''The entry of summary judgment is warranted only when . . . the losing party has had an adequate opportunity to address the issues involved . . . .'').

*Blakely*, 633 F.3d at 949 n.3.
The authority of the court in this regard now finds explicit recognition in the language of current Rule 56(f):

**(f) Judgment Independent of the Motion.**  After giving notice and a reasonable time to respond, the court may:

(1) grant summary judgment for a nonmovant;

(2) grant the motion on grounds not raised by a party; or

(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

-37-

form the basis of bad faith," *Saleh v. Farmers Ins. Exchange*, 2006 UT 20, ¶ 24, 133 P.3d at 435,

and does not breach the implied covenant of good faith and fair dealing as a matter of law.

*Prince*, 2002 UT 68, at ¶ 36, 56 P.3d at 535.  Thus, summary judgment is appropriate on the

Blakelys' sole remaining claim.  *See Young v. Fire Insurance Exchange*, 2008 UT App 114, ¶ 22,

182 P.3d at 917.

Therefore, for the reasons and to the extent explained above,

**IT IS ORDERED** that because the Blakelys' claim for fire loss and USAA's response in

2003 were fairly debatable, USAA's Motion for Summary Judgment (dkt. no. 143) is hereby

GRANTED.

Let Judgment be entered accordingly.

DATED this __5th__ day of December, 2011.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-38-