FILED
2015 APR 2 AM 11:33
CLERK
U.S. DISTRICT
COURT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALAN BLAKELY and COLELYN BLAKELY, | **COURT OPINION AND ORDER** |
| Plaintiffs, | |
| vs. | Civil No. 2:06-cv-00506 |
| USAA CASUALTY INSURANCE COMPANY, | Judge Bruce S. Jenkins |
| Defendant. | |

## I. INTRODUCTION

Continued final pretrial conference and Defendant's Motion for Summary Judgment came before the court on January 23, 2015. L. Rich Humpherys appearing on behalf of Plaintiffs, and S. Baird Morgan appearing on behalf of Defendant.[1] Defendant filed its Motion for Summary Judgment on December 29, 2014.[2] At the previous pretrial hearing held January 7, 2015, Plaintiffs requested and were granted additional time to respond in writing to the summary judgment motion, and the pretrial conference was continued.[3] Plaintiffs filed their opposition to Defendant's summary judgment motion on January 16, 2015,[4] which Defendant responded to on January 21, 2015.[5]

---

[1]Jan. 23, 2015 Minute Entry, (CM/ECF No. 249).

[2]Mot. and Supporting Mem. For Summ. J., filed Dec. 29, 2014 (CM/ECF No. 240).

[3]Jan. 7, 2015 Minute Entry, (CM/ECF No. 243).

[4]Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J., filed Jan. 16, 2015 (CM/ECF No. 247) [hereinafter Pls.' Opp'n].

[5]Reply Mem. in Supp. of Def.'s Mot. for Summ. J., filed Jan. 21, 2015 (CM/ECF No. 248).

The express purpose of the hearing on January 23, 2015 was, *inter alia*, to consider the parties' written submissions and hear argument on Defendant's Motion for Summary Judgment, all within the context of final pretrial. At the January 23, 2015 hearing the court first heard oral argument from Defendant's counsel, Mr. Morgan. For approximately twenty-two pages worth of hearing transcript, Mr. Morgan outlined Defendant's position and the reasons its summary judgment motion should be granted.[6] In response, Plaintiffs' counsel, Mr. Humpherys, effectively declined oral argument.[7] His approximately one page hearing transcript response offered little more than his opening statement: "I think we have addressed these issues numerous times in hearings and I think my opposing memorandum sets forth our position."[8] Following additional oral argument from Mr. Morgan, the court inquired whether either party had anything else to present to the court.[9] Nothing further was offered.

Having considered the parties' briefs, the evidence presented, the oral arguments of counsel, the relevant law, as well as the full record in this matter, the court concludes that Defendant's Motion for Summary Judgment should be GRANTED.

## II. BACKGROUND

This is an action by Plaintiffs Alan Blakely and Colelyn Blakely against their homeowner insurer, Defendant USAA Casualty Insurance Company ("USAA"). All claims and causes of action arise from a basement fire at Plaintiffs' home on August 29, 2002. In their Amended Complaint, Plaintiffs assert four causes of action: (i) breach of contract; (ii) breach of covenant

---

[6]Hr'g Jan. 23, 2105 Tr., (CM/ECF No. 250), at 3:14-24:17.

[7]*Id.*, at 24:20-25:22.

[8]*Id.*, at 24:20-22.

[9]*Id.*, at 32:10.

2

of good faith and fair dealing; (iii) breach of industry standards and statutes; and (iv) intentional infliction of emotional distress.[10]

This case has been extensively pretried from inception to the present.[11] On March 28, 2008, Defendant filed a partial summary judgment motion and memorandum in support.[12] This motion was considered wholly within the context of pretrial. Plaintiffs' third cause of action—breach of industry standards and statutes—and fourth cause of action—intentional infliction of emotional distress—were dismissed during pretrials held March 31 and June 5, 2008, respectively.[13] Plaintiffs' two remaining claims—breach of contract and breach of covenant of good faith and fair dealing—were subsequently dismissed at the sixth pretrial conference held December 2, 2008.[14] With the dismissal of all causes of action, judgment was entered in favor of Defendant on August 24, 2009.[15]

Plaintiffs provided notice of appeal on September 4, 2009.[16] This court docketed the Tenth Circuit's mandate on February 16, 2011 (Blakely I).[17] In the Blakely I mandate, the Tenth

---

[10]Am. Compl., (CM/ECF No. 1; 248-5).

[11]*See* Mar. 31, 2008 Minute Entry, (CM/ECF No. 72); June 5, 2008 Minute Entry, (CM/ECF No. 83); Aug. 13, 2008 Minute Entry, (CM/ECF No. 87); Aug. 28, 2008 Minute Entry, (CM/ECF No. 90); Sept. 12, 2008 Minute Entry, (CM/ECF No. 92); Dec. 2, 2008 Minute Entry, (CM/ECF No. 98); Mar. 22, 2013 Minute Entry, (CM/ECF No. 174); Apr. 23, 2013 Minute Entry, (CM/ECF No. 175); Dec. 10, 2013 Minute Entry, (CM/ECF No. 202); Feb. 24, 2014 Minute Entry, (CM/ECF No. 215); July 30, 2014 Minute Entry, (CM/ECF No. 231); Jan. 7, 2015 Minute Entry, (CM/ECF No. 243); Jan. 23, 2015 Minute Entry, (CM/ECF No. 249).

[12]Mot. for Partial Summ. J., filed Mar. 28, 2008, (CM/ECF No. 70); Mem. of Points and Authorities in Supp. of Mot. for Partial Summ. J., filed Mar. 28, 2008, (CM/ECF No. 71).

[13]*See* Order, filed Aug. 19, 2008, (CM/ECF No. 86).

[14]*See* Order of Dismissal, filed Aug. 7, 2009, (CM/ECF No. 113).

[15]Clerk's J., filed Aug. 24, 2009, (CM/ECF No. 115).

[16]Notice of Appeal, filed Sept. 4, 2009, (CM/ECF No. 117).

[17]Mandate, filed Feb. 16, 2011, (CM/ECF No. 138).

Circuit affirmed summary judgment against Plaintiffs on their breach of contract and intentional infliction of emotional distress causes of action.[18] But the Tenth Circuit reversed this court on the breach of the implied covenant of good faith and fair dealing claim.[19]

Following remand from this appeal and with a single cause of action remaining before the court—breach of the implied covenant of good faith and fair dealing—Defendant filed another summary judgment motion and memorandum in support.[20] Plaintiffs filed an opposition on May 16, 2011,[21] which Defendant responded to on May 20, 2011.[22] A hearing was held May 24, 2011, wherein the court reserved on the summary judgment motion.[23]

On December 6, 2011, the court issued an order granting Defendant's summary judgment motion.[24] The court concluded Defendant's motion should be granted to the extent it was based upon Defendant's "fairly debatable" defense under Utah law.[25]

---

[18]Note: this court's dismissal of Plaintiffs' claim for breach of industry standards and statutes during the March 31, 2008 pretrial conference was not an issue on appeal.

[19]The Tenth Circuit reversed, finding that the claim was not frivolous within the meaning of Fed. R. Civ. P. 16(c)(2)(A). The mandate stated, "Although we express no opinion on the ultimate merits of the Blakelys' claim for breach of the implied covenant of good faith and fair dealing, or whether the evidence is sufficient to withstand any other type of dispositive motion, it is abundantly clear that this claim is not wholly incredible . . . Accordingly, we conclude that the district court abused its discretion in dismissing the claim as frivolous under Rule 16."

[20]USAA's Mot. for Summ. J., filed April 15, 2011, (CM/ECF No. 143); USAA's Mem. in Supp. of Mot. for Summ. J., filed April 15, 2011, (CM/ECF No. 144).

[21]Pls.' Mem. in Opp'n to USAA's Mot. for Summ. J., filed May 16, 2011, (CM/ECF No. 147).

[22]Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J., filed May 20, 2011, (CM/ECF No. 148).

[23]May 24, 2011 Minute Entry, (CM/ECF No. 152).

[24]Mem. Op. and Order, filed Dec. 6, 2011, (CM/ECF No. 153).

[25]Citing several cases, the court noted the then Utah law that where an insured's claim is fairly debatable, the insurer's denial does not breach the implied covenant of good faith and fair dealing. *See, e.g., Prince v. Bear River Mut. Ins. Co.,* 2002 UT 68, at ¶ 36, 56 P.3d 524, 535.

In the December 6, 2011 order, the court outlined several operative facts as not being genuinely at issue. These facts are as follows:

1. On August 29, 2002, a fire occurred in the unfinished basement of Plaintiffs' home in Bountiful, Utah. The Blakelys and USAA agree that this fire was caused by acts or omissions of a third party, Stone Touch.

2. At the time of the fire loss, the Blakelys were insured under a homeowner policy issued by USAA and covering the premises in question.

3. The Blakelys reported the loss to USAA and within 24 hours a local claim adjuster, Curtis Camp, arrived at the premises, conducted an initial inspection and assessment and authorized both the securing of the premises and temporary living accommodations for the Blakelys.

4. The Blakelys requested and were paid for two nights' accommodation at the Grand America Hotel in Salt Lake City. Thereafter, the Blakelys requested and USAA paid for temporary living accommodations at a rental home in the Blakelys' neighborhood and did so through November 30, 2002. All of these payments were made under the Additional Living Expense ("ALE") provision of the USAA policy.

5. The Blakelys considered other options, and then agreed to use Phipps Construction, a contractor pre-approved and urged by USAA, and they signed an agreement with Phipps Construction for the restoration and repair work.

6. A principal concern raised by the Blakelys as to Phipps Construction's structural remodel and restoration plan concerned the number of joists in the basement ceiling and main level floor that required replacement or significant repair work.

7. Phipps Construction retained an independent structural engineer, Mr. Donald Barfuss, who issued an engineering report identifying which joists needed replacement, which could be repaired, and which needed cleaning or treatment by the contractor.

8. The joist replacement/repair recommendations in the Barfuss report were implemented by Phipps Construction or its subcontractors.

9. By mid-November, 2002, Phipps Construction completed the work recommended in the Barfuss report and its repair and restoration work in the Blakelys' home. At that point, still unresolved were some odor and cleaning issues and some personal property claims—claims which USAA submits had ostensibly been resolved and paid by not later than July of 2003, but which the Blakelys insist still remained unresolved.

10. By July of 2003, USAA had made the following payments to the Blakelys or on the Blakelys' behalf: $47,789.94 for dwelling/structural damage; $37,832.70 for unscheduled personal property; and $7,709.56 for temporary housing, totaling $93,332.20.

11. By July of 2003, the Blakelys were still not satisfied with the extent of the floor joist restoration work performed by Phipps Construction pursuant to the Barfuss report, and with the cleaning, repair and restoration of their home and its contents. But instead of making further demand for payment by USAA of additional amounts within the dwelling, contents and temporary housing coverage under their USAA policy, and instead of invoking the contractual remedies available under the terms of that policy to resolve the issue, the Blakelys changed course.

12. On July 1, 2003, the Blakelys commenced a civil lawsuit against Stone Touch for damages, property and personal injury resulting from the August 29, 2002 fire. *See Alan Blakely and Colelyn Blakely vs. Desert Rose Roofing, Inc., dba Stone Touch, et al.*, Civil No. 030914762 (3d Dist. Ct., filed July 1, 2003). Plaintiffs were represented in that action and all related proceedings by attorney Rex Bushman. A year later, on July 20, 2004, USAA filed a motion to intervene in that lawsuit, which was granted.

13. Shortly after USAA intervened in the Stone Touch litigation, the Blakelys notified USAA that they had identified additional losses that they had not previously submitted to USAA. Specifically, the Blakelys' attorney, Rex Bushman, wrote to USAA: "It has become apparent in depositions that plaintiffs

6

have not applied for a significant amount of their losses to their insurer, USAA, because of extreme disappointment with the contractor USAA hired to make remedies for the fire and which while in the process of facilitating remedies offered such a poor performance that further damages were caused my clients."

14. In conjunction with this letter, the Blakelys' attorney also sent USAA a new "inventory of losses" annexed to a letter to Ralph Tate, dated June 30, 2004, as an overall summary of the Blakelys' losses resulting from the fire. Mr. Bushman wrote that "Plaintiffs['] damages . . . amount to several hundred thousand dollars" and that Stone Touch's insurance may not be sufficient "to fully compensate their loss." He reiterated that "Plaintiffs were unsatisfied with the total coverage allowed by your client's adjuster," and explained that

> enclosed is documentation plaintiffs have prepared during the course of this litigation that will more fully explain their losses. This itemization should now be reviewed by your client for consideration of further compensation for the extensive losses which to date have not been adequately compensated by their home owner's policy.

The Blakelys' new loss inventory estimated a total repair cost for their dwelling of $303,890.00 and an estimated replacement cost for damaged personal property of $207,133.50

15. In response, USAA's claims adjuster, Robert Sawyer, in a letter to Rex Bushman dated August 27, 2004, requested additional information, noting that "the information recently supplied to USAA regarding additional claims appears to have some overlap in comparing what USAA has paid for the loss and what is being additionally claimed."

16. The Blakelys received this letter, and in response, Alan Blakely wrote:

> Given the demands placed upon us at the present time with regard to our ongoing litigation [against Stone Touch], it is our

7

> preference to delay the matter of
> additional claims against USAA for the
> time being. We therefore request that
> further examination of this issue be
> delayed pending the resolution of our
> action against Stone Touch.

17. On October 13, 2004, the Blakelys' attorney Rex Bushman
    sent USAA another letter in which he clarified their position:
    "My clients, Alan and Colelyn Blakely, have for several
    reasons advised me to inform you that they will no longer
    pursue a claim against USAA for their fire loss. You may,
    therefore, close out their request for further reimbursement for
    their available coverage on their policy with USAA."

18. Subsequently, the Blakelys realized that despite clear liability,
    Stone Touch would not pay for all of their damages without a
    costly fight. Mr. Nathanael Cook of Adjusters International, a
    public adjuster whom the Blakelys hired to assist them in their
    damages claims against Stone Touch, advised the Blakelys to
    invoke the "appraisal process," a contractual remedy available
    under the express terms of their USAA Policy. Therefore, in
    January 2005, the Blakelys once again changed course,
    deciding to pursue their additional claims against USAA under
    their insurance coverage using the appraisal remedy.

19. Accordingly, Mr. Cook sent USAA a letter dated January 26,
    2005, in which he stated that the Blakelys disagreed with
    USAA's calculation of their losses. This notice was the first
    time the Blakelys invoked the appraisal remedy under their
    USAA policy.

20. Prior to invoking the appraisal remedy in January 2005, the
    Blakelys had not submitted a report or opinion from a
    contractor to USAA that disputed either the September 11,
    2002 Barfuss engineering report or the adequacy of Phipps
    Construction's structural repairs to the joists that had been
    completed in November 2002, based upon Barfuss' report.

21. The January 26, 2005 Cook letter named the Blakelys' selected
    appraiser and requested USAA to do the same within 20 days,
    as required under the policy. USAA promptly responded by
    letter dated February 8, 2005 identifying its selected appraiser.
    Additionally, USAA offered to reexamine the Blakelys' claim

for additional damages outside the appraisal process in order to expedite a settlement and save all parties the expense of the appraisal—an offer to which the Blakelys did not respond.

22. The Blakelys and USAA proceeded with the appraisal process arising from the Blakelys' $468,575.05 appraisal demand, and on October 18, 2005, the panel issued its final appraisal award of $291,356.52.

23. Based on the appraisal award, USAA timely paid the Blakelys an additional $197,524.32, representing the difference between the final appraisal award and the $93,332.20 that USAA had previously paid to the Blakelys or disbursed on their behalf. Upon receipt of this additional payment, the Blakelys executed a release and subrogation assignment in favor of USAA on December 5, 2005.

24. The Blakelys acknowledge that this appraisal award payment by USAA concluded and satisfied all claims under the USAA policy.

25. Nevertheless, the Blakelys commenced this action against USAA in March of 2006—three months after USAA's payment of the balance due under the appraisal award, and while their lawsuit against Stone Touch was still pending.

26. Settlement of all of Blakelys' claims against Stone Touch was reached in mediation on or about August 30, 2006. The settlement included a separate mediated settlement with USAA for its subrogation interest, but embraced the Blakelys' claims for intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, and all other claims that the Blakelys brought or could have brought arising from the fire loss in question. In the mediated Stone Touch settlement, USAA received $205,000 on its subrogation claim of $290,856.52 and the Blakelys received $30,000 on their non-covered claims, including claims for emotional distress.

27. Following payment received by USAA on its subrogation claim through settlement, USAA requested documentation from the Blakelys of attorney's fees and costs incurred by them in the Stone Touch litigation.

28. Upon receipt of the requested documentation, USAA made a payment of attorney's fees and costs to the Blakelys in the amount of $50,000, which was subsequently augmented by an additional payment of $20,695.40 based in part upon additional information gleaned from the November 2007 deposition of Rex Bushman, for a total attorney's fees and costs payment by USAA to the Blakelys of $70,695.40 with respect to the Stone Touch litigation.

Plaintiffs appealed the order granting Defendant's summary judgment motion and the associated entry of judgment.[26] The resulting Tenth Circuit mandate (Blakely II) was docketed with this court on November 16, 2012.[27] The Tenth Circuit in the Blakely II mandate found this court's ruling regarding the "fairly debatable" defense to be incompatible with the law as described in *Jones v. Farmers Ins. Exch.*, 2012 UT 52, 286 P.3d 301.[28] *Jones*, a case which was decided while this court's order was on appeal, determined that "the fairly-debatable defense should not be resolved through summary judgment if reasonable minds could differ as to whether the defendant's conduct measures up to the standard required for insurance claim investigations." *Jones*, 2012 UT 52, ¶ 1, 286 P.3d 301, 302. The Tenth Circuit determined that, in the present case, reasonable minds could differ as to whether Defendant breached the implied covenant of good faith and fair dealing and summary judgment was thus inappropriate.[29]

Importantly, the Tenth Circuit in its Blakely II mandate also made the following determination:

> Plaintiff argues the district court should not have granted summary judgment because the facts were "disputed." But Plaintiff cannot point us to any material facts that are actually in dispute. *We agree*

---

[26]Notice of Appeal, filed Dec. 27, 2011, (CM/ECF No. 156).

[27]Mandate, filed Nov. 16, 2012 (CM/ECF No. 164).

[28]*Id.*, at 12.

[29]*Id.*, at 13.

> *with the district court that the parties dispute merely the significance of the facts, not the facts themselves.*

(CM/ECF No. 164), at 8 (citations and footnote omitted) (emphasis added).

Thus, with the Tenth Circuit's reversal and remand, this court finds itself with no disputed material facts and Tenth Circuit instructions that the jury must determine whether those undisputed facts resulted in Defendant's breach of the implied covenant of good faith and fair dealing.

### III. DISCUSSION

Certain implied terms as crafted, modified, and clarified by the Utah Supreme Court are present in every insurance contract relating to property loss by fire. Insurance is designed to shift risk of loss to the insurance company. That is why premiums are paid. Implied terms are present in every insurance contract as if they are expressly written. One such term implied in all contracts is the duty of good faith and fair dealing.[30] The Utah Supreme Court crafted this implied duty in *Beck v. Farmers Insurance Exchange* as follows: "[W]e conclude that the implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim."[31] The Utah Supreme Court subsequently modified this implied right in *Jones v. Farmers Ins. Exchange*, stating "an insurer cannot be held to have breached the covenant of good faith 'on

---

[30]*Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 798 (Utah 1985).

[31]*Id.*, at 801.

11

the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied.'"[32]

The implied terms are not stand-alone provisions but provisions of the contract that must be viewed and construed as part of the whole contract. The implied words do not purport to change the expressed terms of the written contract, and the division of responsibilities between the parties, as defined therein, but to emphasize the implicit duties of the insurance company. Those duties are a given, but in no sense do they relieve the company or the insured of their own duties under the written contract. The words, implied and expressed, need to be considered as a whole. The insureds are still bound by the expressed contract they entered into. They cannot just be a passive spectator or an oral complainer but must assume and perform the responsibilities they have undertaken.

The insurance contract entered into by Plaintiffs and Defendant contains several express provisions. The following are contained under Section I – Conditions:

> 2. **Your Duties After Loss**. In case of a loss to which this insurance may apply, you must see that the following are done:
>
> . . .
>
>> e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;
>>
>> . . .
>>
>> g. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
>>> (1) the time and cause of loss;

---

[32]*Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7, 286 P.3d 301, 304 (quoting *Billings ex rel. Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996)).

(2) the interest of the Insured and all others in the property involved and all liens on the property;

(3) other insurance which may cover the loss;

(4) changes in title or occupancy of the property during the term of the policy;

(5) specifications of damaged buildings and detailed repair estimates;

(6) the inventory of damaged personal property described in 2e above;

(7) receipts for Additional Living Expenses and Temporary Living Expense, incurred and records that support the Fair Rental Value loss; and

(8) evidence or affidavit that supports a claim under ADDITIONAL COVERAGES, Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and causes of loss.

. . .

5. **Appraisal**. If you and we do not agree on the amount of loss, either party can demand that the amount of the loss be determined by appraisal. If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand.

The two appraisers will then select a competent, impartial umpire. If the two appraisers are not able to agree upon the umpire within 15 days, you and we can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire.

The appraisers will then set the amount of loss. If they submit a written report of any agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will set the amount of the loss. Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be equally paid by you and us.

13

(CM/ECF No. 75-14), at DEF 1065-DEF 1066.

At some point, someone has to define what "the claim" is. Someone has to identify what the parties are talking about, including the parties. "The claim" in 2002 is not the same claim as in 2005 or 2006, as is evident from the history of this case and the available information. That is why methods for defining "the claim" are set forth in the contract.

There is nothing in the contract as a whole which relieves Plaintiffs of their specific undertakings. Plaintiffs acknowledge that whatever they presented in writing during the first year—August 29, 2002 through July 1, 2003—was limited.[33] Instead, most of what they communicated to Defendant was done orally.[34] Additionally, it is uncontested that Plaintiffs never took advantage of the appraisal process during the first year, a process contractually available to them since the fire occurred. Instead, it was not until January 2005 that Plaintiffs first invoked the appraisal remedy.

All of this is preliminary and only background, because Defendant's motion for summary judgment takes a new approach to this case. It avoids entirely the subject of the Blakely II remand—i.e., *Jones* and "debatable" or "non-debatable" as a defense to the alleged breach of the implied covenant of good faith and fair dealing. Instead, Defendant's motion for summary judgment focuses on and asserts an inability on the part of Plaintiffs to proffer any plausible theory of damages or a plausible proffer of damages attributable to or flowing from the alleged breach of the implied provision of the contract. Defendant argues that even if a jury determined

---

[33]Plaintiffs acknowledge that August 29, 2002 through July 1, 2003 is the period of inquiry regarding Defendant's alleged breach of the implied covenant of good faith fair and dealing. *See* Hr'g April 23, 2013 Tr., (CM/ECF No. 176) at 48:12-49:10.

[34]Hr'g Jan. 7, 2015 Tr., (CM/ECF No. 245) at 24:16-26:21.

14

that Defendant breached the implied covenant, Plaintiffs' claim would still fail because there are no resulting damages.

Generally, damages for breach of the implied covenant may be recoverable in the event of insurer bad faith. In *Beck v. Farmers Insurance Exchange*, the Utah Supreme Court stated that "[d]amages recoverable for breach of contract include both general damages, *i.e.,* those flowing naturally from the breach, and consequential damages, *i.e., those reasonably within the contemplation of, or reasonably foreseeable by*, the parties at the time the contract was made."[35] Plaintiffs allege damages for breach of the implied covenant in the form of (i) emotional distress;[36] (ii) economic loss damages;[37] and (iii) attorney fees and costs from the Stone touch litigation, attorney fees and costs from the appraisal demand and process, and attorney fees and costs in the instant litigation.

After careful analysis of the issue, the court agrees with Defendant that Plaintiffs have failed to proffer plausible damages attributable to the alleged breach of the implied contract covenant, and summary judgment is warranted. Absent viable damages, the exercise of trial pursuant to the Tenth Circuit's mandate and the application of *Jones* would be purely academic.

---

[35]701 P.2d 795, 801 (Utah 1985) (emphasis added) (citations omitted).

[36]In their opposition to summary judgment, Plaintiffs additionally argue damages resulting from "aggravation of their physical conditions." Pls.' Opp'n, *supra* note 4, at 5. But the factual record in this matter through all the submissions of the parties fails to allege any form of "personal injury" other than the alleged emotional distress or "mental anguish." Plaintiffs' Amended Complaint makes no mention of physical injuries and otherwise fails to provide notice that Plaintiffs seek damages for physical injuries. See Am. Compl., (CM/ECF No. 1; 248-5), Second Cause of Action re Alleged Breach of Implied Duties. And though Plaintiffs identify in their opposition to summary judgment two of their previous memorandums as setting out in detail their claim for damages, neither document discusses damages for aggravation of Plaintiffs' physical conditions. Pls.' Opp'n, *supra* note 4, at 4 (referring to Pls.' Mem. in Opp'n to Def.'s Mot. for Partial Summ. J., filed May 16, 2008, (CM/ECF No. 75), and Pls.' Mem. in Opp'n to USAA's Mot. for Summ. J., filed May 16, 2011 (CM/ECF No. 147)). As such, Plaintiffs may not now argue physical personal injuries as a source of damages.

[37]The court notes that Plaintiffs acknowledge that the damages for alleged diminished value of residence were dismissed at the hearing of April 23, 2013. See Pls.' Opp'n, *supra* note 4, at 3.

A. <u>Damages for Emotional Distress</u>

The Utah Supreme Court in *Beck* expanded on the notion of recoverable damages for

breach of the implied covenant, specifically discussing emotional damages:

> In an action for breach of a duty to bargain in good faith, a
> broad range of recoverable damages is conceivable, particularly
> given the unique nature and purpose of an insurance contract. An
> insured frequently faces catastrophic consequences if funds are not
> available within a reasonable period of time to cover an insured
> loss; damages for losses well in excess of the policy limits, such as
> for a home or a business, may therefore be foreseeable and
> provable. *See, e.g., Reichert v. General Insurance Co.*, 59
> Cal.Rptr. 724, 728, 428 P.2d 860, 864 (1967), *vacated on other
> grounds*, 68 Cal.2d 822, 442 P.2d 377, 69 Cal.Rptr. 321 (1968)
> (because bankruptcy was a foreseeable consequence of fire
> insurer's failure to pay, insurer was liable for consequential
> damages flowing from bankruptcy). Furthermore, it is axiomatic
> that insurance frequently is purchased not only to provide funds in
> case of loss, but to provide peace of mind for the insured or his
> beneficiaries. Therefore, although other courts adopting the
> contract approach have been reluctant to allow such an award,
> *Lawton v. Great Southwest Fire Insurance Co.*, 392 A.2d at 581-
> 82, **we find no difficulty with the proposition that, <u>in unusual
> cases,</u> damages for mental anguish might be provable.** *See
> Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. at
> 440-55, 295 N.W.2d at 64-72 (Williams, J., dissenting); *cf.
> Lambert v. Sine*, 123 Utah 145, 150, 256 P.2d 241, 244 (1953).
> **The foreseeability of any such damages will always hinge upon
> the nature and language of the contract and the reasonable
> expectations of the parties.** J. Calamari & J. Perillo, *Contracts* §
> 14-5 at 523-25 (2d ed. 1977).

701 P.2d 795, 802 (Utah 1985) (emphasis added) (footnote omitted). The *Beck* court further

clarified that "[c]learly, damages will not be available for the mere disappointment, frustration or

anxiety normally experienced in the process of filing an insurance claim and negotiating a

settlement with an insurer." *Id.*, at 802 n.6.

Thus, from *Beck*, we understand that Plaintiffs can recover for damages that are reasonably foreseeable, that in "unusual cases" this may include damages for mental anguish, but that the foreseeability of such damages always hinges on the contract language itself and "the reasonable expectations of the parties."

Defendant points out that *Beck* has been clarified, or at least modified, by the Utah Supreme Court in *Cabaness v. Thomas*, which states as follows:

> We agree and recognize that emotional distress is typically not recoverable in an action for breach of contract because such damages are rarely a foreseeable result of breach. To be sure, "in the ordinary commercial contract, damages are not recoverable for disappointment, even amounting to alleged anguish, because of breach." *Stewart*, 84 N.W.2d at 823. This is so because, although
>
>> [i]n such cases breach of contract may cause worry and anxiety varying in degree and kind from contract to contract, depending upon the urgencies thereof, the state of mind of the contracting parties, and other elements, but it has long been settled that recovery therefor was not contemplated by the parties as the "natural and probable" result of the breach.
>
> *Id.* Indeed,
>
>> [s]ome type of mental anguish, anxiety, or distress is apt to result from the breach of any contract which causes pecuniary loss. Yet damages therefor are deemed to be too remote to have been in the contemplation of the parties at the time the contract was entered into to be considered as an element of compensatory damages.
>
> *Lamm*, 55 S.E.2d at 813.
>
> But we also agree that in rare cases the non-breaching party to a contract may recover damages for emotional distress. Accordingly, given our discussion above, we hold that a non-breaching party may recover general and/or consequential damages related to

emotional distress or mental anguish arising from a breach of contract when such damages were both a foreseeable result of the breach of contract and *explicitly* within the contemplation of the parties at the time the contract was entered into. As we stated in *Beck,* the applicability of such damages "will always hinge upon the nature and language of the contract and the reasonable expectations of the parties." 701 P.2d at 802.

2010 UT 23, ¶¶ 74-75, 232 P.3d 486, 507-08.

Although not an insurance case, *Cabaness* does provide insight into the Utah Supreme Court's interpretation of *Beck* and the availability of emotional distress damages: such damages are available in "rare cases," where such damages were both foreseeable and "*explicitly* within the contemplation of the parties."

Plaintiffs have failed to provide meaningful evidence or justifications for why this case could be deemed "unusual" or "rare." Furthermore, there is no evidence that emotional damages, particularly those emotional damages beyond "the mere disappointment, frustration or anxiety normally experienced in the process of filing an insurance claim and negotiating a settlement with an insurer" were contemplated explicitly by the parties.

As such, the court determines damages for emotional distress are not available to Plaintiffs as a result of the alleged breach of the implied covenant.

B.  Damages for Economic Loss

Plaintiffs also claim economic loss damages. They suggest that the stress and consequences of the alleged breach of the implied covenant diverted Alan Blakely from his business, resulting in lost income to him, and prevented Colelyn Blakely from returning to any significant gainful employment.[38]

---

[38]Pls.' Opp'n, *supra* note 4, at 6.

Again, as outlined by the *Beck* court, damages are available to Plaintiffs for breach of the implied covenant, but only insofar as those consequential damages were "reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." And Plaintiffs have again failed to demonstrate that such economic losses were foreseeable or contemplated by the parties. The contract between Plaintiffs and Defendant is a policy of homeowner's insurance. It covers (i) Plaintiffs' dwelling; (ii) the dwelling's contents; and (iii) additional living expenses. The policy does not provide personal injury protection or other first-party losses for lost wages or income that are typically a part of other types of insurance policies (e.g., auto insurance). In fact, the insurance policy expressly disclaims personal injury protection for Plaintiffs.[39]

Although an implied contract can embrace or contemplate more than the express contract, Plaintiffs have not shown that such occurred here regarding lost income. As such, economic losses are not available to Plaintiffs as damages for the alleged breach of the implied covenant.

C. <u>Damages for Attorney Fees and Costs</u>

Plaintiffs' damages claims for attorney fees and costs can be divided into three subcategories: (i) attorney fees and costs from the Stone Touch litigation; (ii) attorney fees and costs from the appraisal demand and process; and (iii) attorney fees and costs in the instant litigation.[40]

---

[39]*See* (CM/ECF No. 75-14) at DEF 1069, § 2(f).

[40]The court notes that, although Plaintiffs seek attorney fees and costs as damages arising as a consequence of the alleged breach of the implied covenant, Plaintiffs do not want the issue to go to a jury. Instead, Plaintiffs filed a motion seeking to exclude evidence of attorney fees and expenses and seeking a court order that attorney fees would be decided after the initial jury trial. *See* Motions: (1) For Partial Summ. J.; (2) In Liminie; and (3) To Have Att'ys Fees and Litigation Expenses Decided After Trial, filed Dec. 23, 2014 (CM/ECF No. 237).

As a general proposition, it is true that Utah courts recognize that attorney fees and costs may be recoverable as consequential damages for breach of the implied covenant. But it is also true that the availability of attorney fees as damages is subject to conditions. The Utah Supreme Court in *Billings v. Union Bankers Ins. Co.*[41] put it as follows:

> Attorney fees may be recoverable as consequential damages flowing from an insurer's breach of either the express or the implied terms of an insurance contract. *See Canyon Country Store v. Bracey,* 781 P.2d 414, 420 (Utah 1989). However, as consequential damages, attorney fees are recoverable only if they were "reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck,* 701 P.2d at 801.

918 P.2d 461, 468 (Utah 1996) (footnote omitted).

The parties expressly contemplated a methodology for resolving disputes over payments owed—the appraisal process. When Plaintiffs and Defendant, at the time of contract formation, expressly indicate their contemplation that future disputes will be resolved through submission of an inventory of damaged property and/or use of the appraisal process, is it foreseeable that Plaintiffs will go outside this methodology and instead sue Stone Touch, a third party? We find that it is not. As such, the fees and costs associated with the Stone Touch litigation are not available to Plaintiffs as consequential damages.[42]

Similar reasoning prevents Plaintiffs' fees and costs associated with the appraisal process from being available as consequential damages. Reference to the contract indicates that, in

---

[41]A case referred to by Plaintiffs in their summary judgment opposition to support their claim that attorney fees are recoverable. Pls.' Opp'n, *supra* note 4, at 10.

[42]This conclusion is further strengthened by the written agreement entitled "Subrogation Assignment and Receipt." Plaintiffs signed this document December 5, 2005 at the conclusion of the appraisal process and while the suit against Stone Touch was still ongoing. The document expressly provides that Plaintiffs "agree that any claims arising from this loss, but not covered under this policy and payment, are his/her sole responsibility to pursue at his/her cost and expense." (CM/ECF No. 240-4).

addition to the appraisal process itself, the contract contemplates the method for allocating the costs associated with the appraisal process. As outlined above, the appraisal provision of the contract states as follows: "Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be equally paid by you and us."[43]

Plaintiffs have not argued that Defendant did not pay the cost of its own appraiser or split the other expenses of the appraisal and the compensation of the umpire. Plaintiffs are not arguing Defendant failed to comply with this express contract provision. As such, Plaintiffs are left with no damages claims regarding the appraisal process, because the proffered and uncontested evidence does not support a finding that anything beyond the express terms of the contract was foreseeable or contemplated by the parties.

Finally, the attorney fees and costs associated with the instant action are not recoverable as damages. As analyzed above, Plaintiffs cannot recover damages for emotional distress, economic loss, or attorney fees and costs associated with the Stone Touch litigation or appraisal process. And the fees and costs in the instant case are not stand-alone damages sufficient to support a breach of the implied covenant claim.[44] Plaintiffs must have otherwise suffered damages from the alleged breach before they can assert a claim for the fees and costs associated with bringing the instant action.[45]

---

[43](CM/ECF No. 75-14), at DEF 1066.

[44]See *Neff v. Neff*, 2011 UT 6 ¶¶7, 87-90, 247 P.3d 3380, 403; *see also Holladay v. Storey*, 2013 UT App. 158, ¶48, 307 P.3d 584, 597-98.

[45]Plaintiffs argue that USAA's $70,695.40 payment to Plaintiffs months after Plaintiffs filed this case is sufficient to trigger their claim for attorney fees and expenses in this case. Plaintiffs cite to *Highland Construction Co. v. Stevenson*, 636 P.2d 1034 (Utah 1981) in support of this position. *See* Pls.' Opp'n, *supra* note 4, at 9-10. But

(continued . . .)

## IV. CONCLUSION

Having determined that damages in the form of (i) emotional distress, (ii) financial

distress, and (iii) attorney fees and costs are not recoverable damages, the court finds Plaintiffs

are unable to demonstrate the damages necessary to maintain a breach of the implied covenant

cause of action.

As such, the court orders that Defendant's summary judgment motion is GRANTED and

Plaintiffs' alleged breach of the implied covenant claim is DISMISSED WITH PREJUDICE.

Let judgment be entered accordingly.


DATED this 2 day of April, 2015.


Bruce S. Jenkins
United States Senior District Judge

---

[45](. . . continued)
there are significant differences between *Highland Construction Co.* and the instant case. In *Highland Construction Co.*, an excavating subcontractor sued a general contractor for damages allegedly caused by defective construction plans and unreasonable delays.636 P.2d at 1034. After trial, judgment was entered in favor of defendants. *Id.*, at 1036. On appeal, the plaintiff argued the trial court erred in not awarding it attorney fees, despite not prevailing at trial, "because 164 days after it filed this action and while this action was pending in the court below, [defendant] admitted that he owed and he voluntarily paid [plaintiff] $10,300.78 of the amount it was suing for." *Id.*, at 1037-38. The plaintiff subcontractor pursued attorney's fees under §14-1-8 U.C.A. (1953), which provided that "In any action brought upon either of the bonds provided herein . . . the prevailing party, upon each separate cause of action, shall recover a reasonable attorney's fee to be taxed as costs." *Id.*, at 1038. The *Highland Construction Co.* court found the subcontractor plaintiff's receipt of funds after filing suit qualified them as a prevailing party. *Id.* In contrast to the facts in *Highland Construction Co.*, Plaintiffs here have not provided evidence that Defendant admitted Plaintiffs are entitled to the attorney fees and costs associated with the Stone Touch litigation. Additionally, and more importantly, Plaintiffs have not pointed to a statute similar to §14-1-8 U.C.A. that entitles them to attorney fees, even if this court deemed that Defendant's $70,695.40 payment to Plaintiffs made Plaintiffs a prevailing party. As such, *Highland Construction Co.* is inapplicable and unhelpful to the instant case.

22